(18 Misc. Rep. 314.)

MARSH et al. v. NE–HA–SA–NE PARK ASS'N.

(Supreme Court, Trial Term, Fulton County. October, 1896.)

1. DEEDS—DESCRIPTION—INACCURATE LANGUAGE.
   A deed is not void for uncertainty of description because in the phrase "south, to the place of beginning," the word "south" should be "north," when only by going north could the place of beginning be reached.

2. SAME—PROOF OF—DECLARATIONS OF GRANTOR.
   Declarations by a decedent that he had sold certain lands, no deed being produced or accounted for, are insufficient to prove a conveyance by him of such lands.

3. SAME—LAND IN POSSESSION OF ANOTHER.
   Posting notices against trespassers along a part of two of the boundary lines of a tract of 60,000 acres of uninclosed and unoccupied forest land, and employing watchers to keep trespassers off the same, do not constitute "actual possession" thereof, within 1 Rev. St. p. 739, § 147, making void grants of lands which are in actual possession of a person claiming a title adverse to grantor.

4. TAX TITLES—SALE OF SEVERAL PARCELS AS ONE.
   Where lands were for several years assessed as one parcel, and in each year the tax for that year on a different part thereof was paid, a sale of all of said lands in one parcel for the aggregate unpaid taxes is void.

Action by Lelia E. Marsh and George N. Ostrander against Ne-ha-sa-ne Park Association to recover the N. E. ¼ of township 38, Totten and Crossfield's purchase, Hamilton county, except 1,000 acres.

Township 38 was assessed for the years 1836, 1837, 1838, and 1839 as one parcel. The taxes for 1836 were paid on 12,816 acres, including the N. E. ¼ (the land in controversy). The taxes for 1837 were

paid on 13,588 acres, including the N. E. ¼. The taxes for 1838 were paid on 7,984 acres, excluding the N. E. ¼. The taxes for 1839 were paid on 7,596 acres, excluding the N. E. ¼. In 1843 the comptroller sold the township to the state as one parcel for the taxes due on the whole for the years 1836, 1837, 1838, and 1839. Some lots were redeemed from the sale, and the comptroller conveyed the balance to the state by a deed describing the land conveyed as follows:

"Eleven thousand and ten acres of land, being what remains of 20,000, being in Long Lake, after deducting lots 2 and 3, 312 acres; lot 5, 208 a.; lots 6 and 7, 416 acres; lots 8 and 9, 417 a.,—all in Gorton's tract; lot 23, in Sergeant's tract, 208 a.; lot 26, 208 acres; lots 27, 28, 29, 30, 38, 41, 42, 57, and 58, 2,183 acres; lots 10, 22, 43, 56, 39, 54, 53, and 52, 2,012 acres; lot 55, 280 acres; lots 31, 32, 33, 34 & 35, 1,247 acres; lot 49, 250 acres,—northeast corner of the N. East ¼, 250 a.; and one thousand acres on N'ly line, 115 chains from northerly corner; thence on northerly line 125 chains; thence south, 31° 21' east, 80 chains; thence north, 58° 40' east, 125 chains; thence north, 31° 21' west, 80 chains."

Thereafter the state conveyed to defendant's grantors, and defendant claims in this action from such tax sale and conveyances.

Frank E. Smith, for plaintiffs.
Charles E. Snyder, for defendant.

KELLOGG, J. The plaintiffs have shown a paper title to an undivided five-sixths of the lands described in the complaint if the objections made to the plaintiffs' proof are not well taken. The evidence discloses: First, a patent from the state to Alexander Macomb, dated February 28, 1787; second, a deed from Alexander Macomb to William Edgar, dated July 5, 1791; third, a deed from William Edgar to James Barrow, dated June 30, 1821; fourth, the will of James Barrow in New York county, December 4, 1862; fifth, deeds from the devisees of James Barrow (owners of five-sixths) of all their right, title, and interest in lands in question. Many objections were made by defendant's counsel to the admission of the proof offered by plaintiffs to establish this paper title. None of the objections urged in his brief upon the argument appear to me substantial.

The objection that the record of the patent to Macomb in the secretary of state's office does not show that the original patent was duly sealed is disposed of, I think, by the court in Williams v. Sheldon, 10 Wend. 654.

The objection that copies of records of patents and deeds in the secretary of state's office, duly certified, are not competent evidence, implies an oversight of the statute which makes them evidence.

The objection that the deed from Macomb to Edgar is uncertain in description, and therefore void for uncertainty, does not appear to be well taken. The intent of the grantor is apparent. The description is perfect until the last boundary line is described. Then, obviously, the word "south" was inadvertently used, instead of "north," since the word is followed by the words "to the place of beginning," and only by going "north" could the place of beginning be reached. The same description is followed in the deed from Edgar to Barrow. It is by courses and distances from a definite, easily determined point: "The most northerly corner of the said township" (township

38). The certificates of the secretary of state and the county clerks of Montgomery county and Hamilton county prove that no deed from James Barrow has been in the secretary of state's office, or in either county recorded, conveying any portion of the lands described in deed from Edgar to James Barrow, except one deed of 1,000 acres to one Bennet, which deed is dated October 14, 1833, and recorded in the Hamilton county clerk's office. It must be conceded that James Barrow, at the time of his death, in 1862, had vested in him the title to all the lands described in deed of Edgar to Barrow, except the 1,000 acres deeded to Bennet, unless the defendant, by competent evidence, has shown that James Barrow, prior to his decease, by deed executed as the statute provides, and duly delivered, passed over such title to some person or corporation competent to take.

The defendant urges certain written memoranda, made by James Barrow, and found among his papers, and declarations made by letter to the comptroller of the state, as sufficient to establish such a conveyance by him of the title, at some time, to some person unknown, of all these lands, except 250 acres in the northeast part of the township. One memorandum is:

"J. A. Barrow sold his interest in the above lands, except 250 acres, as far back as 1840.

"[Signed]                                            James Barrow."

Another is:

"Sold all my interest in 5,980 acres, except 250 acres, now retained in the extreme N. E. quarter of the township, the taxes upon which are now paid to and inclusive to 1842.

"February, 1844.                                     James Barrow."

Another is:

"Taxes paid on lands in Hamilton county to 1849, inclusive from 1822, $92.59; all lands being sold except 250 acres in the N. E. corner."

In a letter to the comptroller of the state, dated October 15, 1839, he says:

"It is important for me to know what is my remedy against those to whom I have sold parcels of land, some of which were made as early as 1822–23 and subsequently in 1833, when I sold the last parcel, and have from that time reserved but 250 acres in the extreme northeast corner of the township."

Under date of December 16, 1843, he again wrote to the comptroller, and used this language:

"I will esteem it a particular favor would you with as little delay as possible let me know what were the assessments of the years 1828, 1829, 1830, for each year previous to which years I have sold 1,900 ac., leaving me the charges upon 4,000 ac. which I was bound to pay, including 1830, since which year I had made sale of most of the residue of the original 5,980 acres, leaving me to pay taxes from 1830 to this time on 250 acres. I am particularly anxious to have a right understanding upon the subject of arrears of taxes from 1828 to 1830 and to 1835, as by my guaranty to the purchasers from me I must see all free from incumbrance to the time of sale, and wish to pay to Mr. White my proportion of taxes upon the 250 acres for the years he has paid, viz. from 1835 to 1837, my proportion of taxes on 250 acres in those years. * * * I would ask what proportion of the original 5,980 was sold (as entered) for taxes of 1838 and 1839, one of the purchasers from me living in this city, and is desirous to know."

No deed is offered for inspection, nor the records of any. No other proof is offered of the actual delivery of any deed, nor of the contents of any particular deed, and no proof whatever of the loss of any deed; but the defendant still urges that he has through these declarations proven that the title of James Barrow was in some way voluntarily divested. These declarations, it is urged, are against interest, and, as such, may be taken as evidence; but it cannot be claimed that they can be received as proof of any fact which James Barrow would not be permitted to testify to if living. The true test of competency was, I think, well declared in Keator v. Dimmick, 46 Barb. 160, where declarations were received as to the delivery of a certain deed:

"The admissions or declarations of parties are competent evidence against them where parol evidence of the fact sought to be shown by such admissions or declarations would be competent."

"There are many cases which hold that the parol declarations of a person having title to land are inadmissible as evidence to defeat that title [citing many cases]. This rule also excludes declarations when the fact sought to be established by them cannot be proved by parol evidence. To illustrate, when a party shows he has a legal title to land, it cannot be taken from him by evidence that he has said he had no title to it."

There has been no departure from this rule in any court in this state, so far as I have been able to discover.

Chadwick v. Fonner, 69 N. Y. 404, was an action to compel the specific performance of a parol contract for the sale of land. All the proof in such a case, from its nature, lies in parol, and every fact necessary to be proven may be proven by oral testimony. Lyon v. Ricker, 141 N. Y. 225, 36 N. E. 189, presented a single issue, whether a certain deed, admittedly made and delivered to the defendant, was delivered with instructions by the grantor to deliver it to the plaintiff at the death of the grantor. The instructions being oral, necessarily only oral testimony could be given. In both cases the admissions or declarations of the deceased upon the question litigated were within the rule stated in Keator v. Dimmick, and declared competent as evidence.

If, upon the trial of this action, James Barrow had been a witness for the defendant, he might have been interrogated as to the delivery of some written instruments, with or without instructions; but he would not have been permitted to testify as to their contents, or the formality of their execution, until it had been first shown that these instruments were not in existence. Presumably, these written instruments—if any in fact were ever delivered—are in the possession of the parties to whom delivered, and should be produced to speak for themselves. Inspection would disclose whether they were sufficient to carry the title to lands out of one, and over to another. To accept (as counsel for defendant urges) the declaration of James Barrow as here given, as the equivalent of all the proof required, in case James Barrow had been offered as a witness, is asking the court to disregard all rules of evidence as well as the provisions of the statute for the prevention of frauds and perjuries, and to give to a parol declaration the effect which the statute says shall be given

only to a written instrument under seal.    In Walker v. Dunspaugh, 20 N. Y. 170, Denio, J., says: "A party cannot make title to land by a parol admission of his adversary." I see no reason for a distinction in the quality of proof required to show title in a party from that required to show it out of a party after it has once been shown in. Both must be accomplished by the same formal means. I therefore regard the declarations of James Barrow, as they stand in the case, as wholly insufficient as proof of any grant or conveyance of title by him.

The defense of champerty does not seem to me from the proof to have been established.

The statute reads:

"Every grant of land shall be absolutely void, if .at the time of the delivery thereof, such lands shall be in the actual possession of a person claiming under a title adverse to that of the grantor." 1 Rev. St. p. 739, § 147.

In reference to this statute, Kent, C. J., says:

"The ancient policy [having its origin in a statute in the time of Henry VIII.] which prohibited the sale of pretended titles, and held the conveyance to third persons of lands held adversely at the time to be an act of maintenance, was founded upon a state of society which does not exist in this country." 4 Kent, Comm. 447.

Selden, J., in Crary v. Goodman, 22 N. Y. 170, says:

"No reason exists for giving to the champerty act a liberal or enlarged construction. It is the relic of an ancient policy, which has been treated with but little favor by either legislatures or courts in modern times."

The actual possession here required to avoid a grant must be shown by plain and unequivocal proof. The possession must be actual as distinguished from constructive, and it must be under "a title,"—some grant of the lands apparently good. Livingston v. Iron Co., 9 Wend. 516; Crary v. Goodman, 22 N. Y. 170. What is meant by the legal phrase "actual possession" is defined by Folger, J., in Churchill v. Onderdonk, 59 N. Y. 136:

"The mind struggles in vain to find a word or words which will express more sharply and definitely than do the words 'actual possession' the fact which these words set forth. 'Actual possession' is the same as pedis possessio or pedis positio; and these mean a foothold on the land, an actual entry, a standing upon it, an occupation of it, or a real demonstrative act done."

The courts in many reported cases have illustrated the meaning of the words "actual possession" by application of its meaning to facts presented. The evidence of "possession" under a claim of title founded upon a written instrument, which shall be deemed sufficient to defeat the actual title, is defined by section 370 of the Code. In the champerty act the legislature failed to state what acts should constitute possession, but used the more specific term "actual possession." It would be strange if the legislature meant by this a less obvious possession than the one it defines when both operate to the same end,—the defeat of the actual title.

The question of actual possession must be determined here at the date of the delivery of deeds by the devisees of James Barrow (November, 1892,—May, 1893). Dr. Webb purchased in May, 1891, and sold to defendant in June, 1894. Before Dr. Webb purchased,

there is no pretense of actual possession in anyone.   After purchase by Dr. Webb with other lands, the premises in question became a small part of a tract of some 200,000 acres, a tract claimed by Dr. Webb, some 300 square miles of forest land, surrounded by forests. Of this tract some 60,000 acres, including the lands in question, or 90 square miles, was apparently intended by Dr. Webb as territory for private hunting and fishing.   It was all virgin forest land, with unoccupied and uninclosed forest lands on all sides.   At the time of the delivery of the deeds from the Barrow devisees, no one resided or had a domicile upon any portion of the lands.   The only house was a small log shanty, covered with bark, used then and previously as a temporary hunters' resort.   No portion of the land was cultivated or improved.   Dr. Webb did some surveying upon the lands, paid the taxes, and posted some notices on the line between townships 38 and 37 and on the St. Lawrence county line, warning people not to cut timber, hunt, or fish on lands in certain townships. How many notices were posted does not appear.   The line between townships 38 and 37 is six miles long.   Dr. Webb employed watchers to keep trespassers off the 60,000-acre tract.   What these watchers did, or how much time was spent by them on the tract does not appear.   Wire was strung along part of the line between townships 38 and 37, but it does not appear that this was done before the delivery of the last deed (May, 1893).   These acts do not, in my opinion, constitute an "actual possession" of these wild lands, such as was contemplated by the legislature as necessary to avoid a deed. The claim of defendant that the patent to Macomb has been declared void by the state, by reason of the failure of the patentee to comply with the clause in the patent touching actual settlement, has nothing in proof to support it.   The legislature has not at any time declared its intent to assert a forfeiture, and there has been no judgment or office found.   The origin of defendants' title is a tax sale to the state in 1843, and this sale is claimed by the plaintiffs to be void, for the reason that it appears that the sale was for taxes which the land did not owe, and it is also claimed by the plaintiffs that the deed to the state is void for uncertainty of description. The assessments for the years 1836, 1837, 1838, and 1839 of township 38 (20,000 acres in Hamilton county) were made against the 20,000 acres as one parcel, and so returned each year to the comptroller.   The taxes for the years 1836 and 1837 on the N. E. ¼ (the lands in question) were paid to the treasurer or comptroller after return by the collector of taxes, and before sale, leaving taxes unpaid for the year 1836 on 7,184 acres of this parcel, and leaving unpaid for the year 1837 the taxes on 6,412 acres of the parcel.   The taxes for the year 1838 were not paid on the N. E. ¼ nor for the year 1839, but taxes were paid for those years on other parts of the 20,000-acre parcel, leaving taxes unpaid in 1838 on 12,016 acres, and in 1839 unpaid taxes on 12,404 acres.   At the sale of 1843 for the unpaid taxes of 1836, 1837, 1838, and 1839, the sale book of the comptroller plainly disclosed four separate parcels of land, each liable for a tax distinct and separate in amount, viz.:   For the year 1836,

a parcel of 7,184 acres, excluding the N. E. ¼, on which was an unpaid tax of $33.77, besides interest. For the year 1837, a parcel of 6,412 acres (excluding the N. E. ¼), on which was an unpaid tax of $43.64, besides interest. For the year 1838, a parcel of 12,016 acres (including the N. E. ¼), on which was an unpaid tax of $93.97, besides interest. For the year 1839, a parcel of 12,404 acres (including the N. E. ¼), on which was an unpaid tax of $129.81, besides interest. And a sale of each parcel separately for the tax unpaid on such parcel was the plain requirement of the statute.

The statute provided:

"Whenever a sum in gross is assessed upon a tract, piece or lot of land any person claiming a divided or undivided part thereof may pay to the treasurer any part of the tax, interest and charges due thereon proportionate to the number of acres claimed by him on the certificate of the comptroller, and the remaining tax, interest and charges shall be a lien on the residue of the land only."

The payment of the tax on the N. E. ¼ of this township for the years 1836 and 1837 relieved that portion of the tract from the lien or liability for the remaining tax on the tract, and left that unpaid portion of tax "a lien on the residue of the land only." Instead of selling each parcel for the unpaid tax appearing against that parcel, the comptroller, in 1843, bunched the unpaid taxes for those four years, making the whole unpaid tax, exclusive of interest, $301.19, and sold to pay this tax, and in one parcel, the 12,404 acres,— the parcel upon which was unpaid the tax for the year 1839. The state was the purchaser, and the title so acquired is the title under which defendant holds. This sale was clearly unauthorized. The N. E. ¼ was included in this sale, and it was sold for taxes of 1836 and 1837, assessed against and a lien upon other portions of the tract only. It was not only unauthorized by the existing statutes, but it was beyond the power of the legislature to authorize it. The legislature, having given leave to pay the tax on any portion of the entire parcel, and so relieve that portion of all lien for unpaid taxes on the remainder of this parcel, made it impossible to authorize such a sale. It could not direct the property of A. to be taken to pay the debt of B. Nor does the law touching redemption from tax sales furnish any relief to the owner of the portion of an entire tract upon which the taxes have been paid. To redeem, he must pay that proportion of the whole tax for which sale was made, which the acreage he seeks to redeem bears to the acreage of the whole parcel.

The defendant urges that the court must presume the comptroller did his duty, and sold the land in parcels for each of the four years. Such a presumption cannot avail against the positive proof in this case, that he did not so sell. This question of the validity of a sale for taxes, made as in this case shown, is not at this time new in the courts. In every instance, so far as I have been able to discover, where the question has arisen, the court has declared the sale void. Insurance Co. v. McKay, 5 Abb. Prac. (N. S.) 445; Thompson v. Burhans, 61 N. Y. 52; People v. Hagadorn, 104 N. Y. 516, 10 N. E. 891; Turner v. Boyce, 11 Misc. Rep. 502, 33 N. Y. Supp. 433. See, also, Cooley, Const. Lim. 521; Black, Tax Titles (2d Ed.) §§

228–260. This is a jurisdictional defect in the proceedings, and is not cured by the statutes of 1885 or 1893. Joslyn v. Rockwell, 128 N. Y. 334, 28 N. E. 604. If the deed to the state and the deed from the state were to be regarded as otherwise valid, I am not satisfied—under the rule laid down for construction of tax deeds in Zink v. McManus, 121 N. Y. 259, 24 N. E. 467; Curtis v. Supervisors, 22 Wis. 167; Stout v. Mastin, 139 U. S. 152, 11 Sup. Ct. 519; Black, Tax Titles, § 406; Tallman v. White, 2 N. Y. 66; Devl. Deeds, § 1405—that the land here described can be located with a reasonable degree of certainty. The description in the deeds is "eleven thousand and ten acres of land, being what remains of 20,000, being in Long Lake, after deducting." Then comes a reference to the lands to be "deducted." One piece is described in this language: "The northeast corner of the northeast quarter of township, two hundred and fifty acres." I apprehend that no surveyor or civil engineer could, with any degree of certainty, fix the boundaries of this parcel from this description. Whether the form of the piece should be a triangle, a square, or a parallelogram it is impossible to say. The defendant says it is a parallelogram (320 rods long and 125 rods wide), and so says his expert, Engineer Wood; but neither can give any satisfactory reason. The engineer says he could as well have located it in any other form, but he had examined the map in Montgomery county (filed by some unknown person in 1848, three years after the date of the deed to the state), and there discovered the lines of a lot in this form, and assumed that to be the land excepted; but the deeds make no reference to this map, nor do the assessors, nor does the sales book in the comptroller's office, touching any lands in the N. E. ¼ of this township, nor is the exception an exception of any lot, either by numbers or by direct or indirect reference. It is simply "250 acres" in the N. E. corner of the N. E. ¼ of the township.

It is too plain to require argument that it is necessary to define with reasonable certainty the exception in order to define and locate with reasonable certainty the land intended to be conveyed. In the deeds among the lands to be "deducted" are "lots 2 and 3, 312 acres; lot 5, 208 acres; lots 7 and 6, 416 acres; lots 8 and 9, 416 acres,—all in Gorton's Tract." The total acreage in this exception is 1,352 acres. The difficulty here is to determine first the location of "Gorton's Tract." The tract is not recognized or mentioned on any known map. It does not appear to be known to any living witness. No one is able to speak of it, and the only places, apparently, in which the tract is referred to, are in these deeds and in the sales book of 1843 in the office of the comptroller. "Gorton's Tract" is twice mentioned in the sales book in lands redeemed after sale, and, before deed was given to the state, we see here written "lot 5, Gorton's Tr.;" "lots 2 and 3, Gorton's Tr. 312a." This seems to be the first appearance of this tract. It appears singular that the great diligence of counsel displayed in this case should not have produced some living witness or some map to show in what part of this township "Gorton's Tract" was located. From the sales book and the

deeds, the lots were apparently mapped and numbered as early as 1845. The map, so far as it now appears, was made by the comptroller or for his use, and is wholly unknown now, and has remained. unknown since 1845. The explanation offered by defendant, and which is offered by way of argument only, is that these lots, 2, 3, 5, 6, 7, 8, and 9, "all in Gorton's Tract," are the same as the lots of that number appearing on the map filed in Montgomery county in 1848 as in "Sergeant's Tract." This is an unwarrantable assumption, it seems to me, for the reason that there is no proof to sustain it. On the other hand, there is strong proof against it. It would be noticed that both "Sergeant's Tract" and "Gorton's Tract" are recognized both in the sales book of the comptroller and in the deeds in question. That the comptroller made the mistake of overlapping one tract upon the other is not to be presumed. They are apparently two separate and distinct tracts. There is clear proof of the location of "Sergeant's Tract." The map in the Montgomery county clerk's office shows that it embraced all of this thirty-eighth township in Hamilton county, except the N. E. ¼, and the lots plotted and numbered are consecutively 1 to 58, inclusive. Lots 8 and 9, in the deeds, described as in "Gorton's Tract," can hardly be said to be the same as lots 8 and 9 shown on the map to be in "Sergeant's Tract." While there does not appear to be more than one lot numbered 8 and one numbered 9 in the township, these two lots are mentioned in the sales book (year 1839) as in "Sergeant's Tract," and are nowhere referred to as in "Gorton's Tract." Lots 2 and 3 in "Sergeant's Tract" embrace 416 acres, while lots 2 and 3 in "Gorton's Tract" are declared in the deeds to embrace 312 acres.

The only conclusion to be logically reached would seem to be that the comptroller had some private information touching a tract known as "Gorton's Tract," in this township, located outside of "Sergeant's Tract," or in the N. E. ¼; but the N. E. ¼, the proof shows, has no lots numbered 8 or 9, and none which correspond in acreage with those here excepted. There would have been no such uncertainty if the map showing the "Gorton Tract" had been incorporated into the deeds, but the proof in this case shows, so far as it shows anything on the subject, that "Gorton's Tract" is impossible of location, and this makes it impossible to determine the location of the lands intended to be conveyed by these deeds.

This leads to the conclusion that judgment must be in favor of plaintiffs for the undivided five-sixths of the lands described in the complaint.