Richard D. MOODY and the Anaconda Company, a Montana Corporation, Plaintiffs,

v.

GENERAL BERYLLIUM CORPORATION, a New York Corporation, and Robert Ford, Defendants.

No. C 40-63.

United States District Court
D. Utah,
Central Division.

Nov. 29, 1963.

Thorpe Waddingham and Dudley Crafts, Delta, Utah, for plaintiff Richard D. Moody.

Robert G. Dwyer, Salt Lake City, Utah, and S. N. Cornwall and Howard L. Edwards, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for plaintiff Anaconda Co.

Udell R. Jensen, Nephi, Utah, and Frank Allen, of Clyde, Mecham & Pratt, Salt Lake City, Utah, for defendant General Beryllium Corp.

H. Byron Mock and Kent Shearer, of Neslen & Mock, Salt Lake City, Utah, for defendant Robert Ford.

CHRISTENSEN, District Judge.

The above entitled cause came on regularly for trial before the court sitting without a jury, on the complaint of the plaintiffs on September 18, 1963.

Evidence both oral and documentary was presented on behalf of both the plaintiffs and the defendants, and the court having heard the evidence adduced, and the arguments of counsel, and having considered the same and being fully advised in the premises now makes the following:

## FINDINGS OF FACT

1. The plaintiff Richard D. Moody is a citizen of the State of Utah. The plaintiff The Anaconda Company is a corporation incorporated under the laws of the State of Montana with its principal place of business in the State of Montana. The

defendant General Beryllium Corporation is a corporation incorporated under the laws of the State of New York with its principal place of business in the State of New York. The defendant Robert Ford is a citizen of the State of Wyoming. The amount in controversy exceeds the sum of Ten Thousand Dollars ($10,000.00), exclusive of costs.

2. This is an action to obtain a declaratory judgment pursuant to Title 28, United States Code, § 2201, and Rule 57, Federal Rules of Civil Procedure.

3. Plaintiff Richard D. Moody, designated as grantor, under date of May 15, 1961, entered into a contract, herein termed the basic contract, with defendant General Beryllium Corporation, designated as grantee. The basic contract covers certain unpatented lode mining claims and certain interests in mining claims and property situated in Juab County, State of Utah. The said contract identifies the property concerned in the transaction and the subject matter thereof as follows:

(a) Twelve (12) unpatented lode mining claims owned individually by the Grantor and known as the Teapot, Teapot 1–5, inclusive; Hot Days 2, 4, 6, 8, 10, and 12.

(b) Thirty-six (36) unpatented lode mining claims located jointly by the Grantor and one Ray Needham and known as Boone Claims Nos. 1–36, inclusive.

(c) A lease from the State of Utah of lands contained in that certain mineral lease from that state, the same being Mineral Lease No. 18077 bearing date the 25th day of January, 1960, and including one hundred sixty (160) acres, more or less.

(d) A lease from the State of Utah of lands contained in that certain mineral lease from that state wherein Leland Sanderson and Berniece Sanderson, his wife, Bernard Christensen and Rosemary Christensen, his wife, Joseph Christensen, and Leland Sanderson, as agent and manager of Ute-Cal, a syndicate association, are lessees, the same being Mineral

Lease No. 16049 bearing date the 29th day of April, 1957, and including one hundred sixty (160) acres, more or less, and assigned by the said lessees to the Grantor herein, such assignment being dated the 30th day of August, 1960, and assigning to the said Grantor all lands contained within said lease.

(e) That certain lease dated the 17th day of April, 1961, wherein Frelen Shurtz and Stella Shurtz, husband and wife, and Cecil F. Shurtz and Barbara Shurtz, husband and wife, are lessors, and the Grantor is the lessee, the property included in such lease being fifty (50) unpatented lode mining claims.

(f) That certain lease dated the 18th day of January, 1961, and executed and acknowledged on the 18th day of April, 1961, wherein Homer U. Peterson and Alma L. Peterson, husband and wife, and Phill Rawlinson and Sharon Rawlinson, husband and wife, are lessors, and the Grantor is the Lessee, the property concerned in such lease being one hundred thirty (130) unpatented lode mining claims.

(g) That certain lease bearing date the 16th day of August, 1960, wherein Leland Sanderson and Berniece Sanderson, husband and wife, Bernard Christensen and Rosemary Christensen, husband and wife, and Joseph Christensen, a single man, and Leland Sanderson, as agent and manager of the Ute-Cal, a syndicate association, are lessors, and the Grantor is lessee, the property concerned in such lease being thirty-four (34) unpatented lode mining claims.

3. By instruments dated May 15, 1961, entitled "Amendment to Lease Agreement", entered into between plaintiff Moody and defendant General Beryllium Corporation, and joined in by the respective lessors, the parties amended each of the above identified leases, except those issued by the State of Utah.

4. The total purchase price for the property covered by the basic contract was One Million Dollars. Said contract provided for the payment of $5,000.00 by General Beryllium Corporation to Moody on the execution of the instrument. The

contract further provided that $25,000.00 should be paid upon approval of title by General Beryllium Corporation.

5. The basic contract in paragraph I. D. (page 5) provided as follows:

"D. On execution of this instrument and payment of the Five Thousand Dollars ($5,000.00) specified, the Grantee shall have full and immediate right to possession of the property concerned and full and complete rights of access to every part thereof for all purposes of examination and proof and perfection of title, exploration, drilling, and analysis by geological, geophysical, or geochemical means, and the right to perform any and all such acts. It shall have the right, further, to amend or relocate any of the claims concerned and adjust the boundaries thereof as may be necessary in improving and perfecting the title to any of the claims concerned, and in its own name, provided, that any such amendment or relocation thereof shall be subject to the terms of this instrument and any location certificates made and recorded in that respect shall contain a statement to that effect. On execution of this instrument or within thirty (30) days thereafter, the Grantor shall deliver to the Grantee or its agent or attorney all location certificates and amendments thereof with respect to all of the claims herein concerned."

Said contract in Article IX provided as follows:

"IX. *LOCATION OF FRACTIONAL CLAIMS*

"In event that, through resurvey, relocation, or amendment of existing claims, the location of fractional claims within the periphery of the claims concerned should become necessary, it is stipulated and agreed that any such claims so located shall be subject to all the terms and conditions of this instrument."

6. Subsequent to May 15, 1961, and prior to October 13, 1961, defendant General Beryllium Corporation represented to the plaintiff Moody that as a result of this investigation the cost of amending, relocating and adjusting the boundaries of the claims which were the subject matter of the basic contract and as provided therein would be prohibitive and further represented to Moody that of the claims covered by the basic contract 222 of such claims required such curative title work and that in lieu of the amendment, relocation and adjustment of the boundaries of such claims, the entire area should be blanketed with new claims. A portion of the 222 claims was in fact effectively marked upon the ground. Some monuments were missing. A substantial number of such claims were marked, monumented or laid out in an unsatisfactory manner. A number of such claims exceeded statutory size and in some cases lines were not parallel. By letter dated August 18, 1961, addressed to plaintiff Moody, defendant General Beryllium Corporation, through its counsel, made reference to these conditions and proposed a remedy as follows:

"Under these circumstances, General Beryllium is faced with a choice between two methods of procedure; it may, on the one hand, abandon the entire transaction and seek the return of money thus far paid on the basis that there exists a total failure of consideration. On the other hand, it may proceed to make a new and proper location of claims over the area concerned and adjust with you and Mr. Moody the costs of performing that work * * *

"After careful consideration, General Beryllium has decided to attempt to pursue the second course of action. In so doing, it seeks to avoid the drastic results consequent on the first course of procedure * * * You are therefore advised that it intends to commence immediately a program of location of claims over all of the property concerned, with the exception of those few claims

which are properly laid out, monumented and described. It does so in an attempt to preserve for the benefit of all parties concerned, whatever benefits may be present in this transaction, but without waiver of its right to rescind the entire transaction, should this course of action prove to be of no avail.

"You will recall that in the contract warranties were made with respect to location procedures and the provisions were made for reduction of the purchase price in the event of failure of title as therein defined. It is the position of General Beryllium that breach of the warranties is present, and that there has been substantial failure of title in many respects. Problems are present in these respects whose solution is not easy. In view of the situation in the field, location procedure must be established immediately or the property may be lost to all concerned; the procedure cannot wait upon resolution of the problems. You are advised, however, that General Beryllium intends to hold you responsible to the extent of the contract provisions for the cost of relocation and with respect to those provisions which are applicable on failure of title. The amount involved cannot be made certain until after the work has been completed and determination has been made of the property which may be lost. General Beryllium will be glad to consult with you with respect to the performance of the work, the procedure to be followed and the plan which it intends to pursue. Mr. Moody is invited to participate in the work, to minimize the expense by the furnishing of labor or materials, or both, and to assist in the work in any manner he desires.

"This letter is written so that you may be fully advised of the state of the title, of the attitude of General Beryllium in contemplation of it, and the nature and purpose of the program of location now being instituted. We shall be glad to discuss this matter further with you at any time and we sincerely hope that the problems above referred to—payment of cost of location and adjustment of purchase price in accordance with contract provisions—may be specifically resolved and on a reasonable basis."

7. Thereafter, under date of October 13, 1961, a further agreement in writing was entered into between the plaintiff Moody and the defendant General Beryllium whereby Moody credited General Beryllium Corporation with the sum of $11,100.00 to be deducted from the payment of $25,000.00 due from General Beryllium Corporation to Moody on September 15, 1961, the balance of $13,900.00 to be paid by General Beryllium Corporation to Moody upon execution of said agreement. The sum of $11,100.00 was arrived at prior to the completion of the blanketing with new claims of the property conveyed and assigned and was based on the estimate of $50.00 per claim for each of the 222 defective original claims. The said curative work, consisting of the staking of mining locations over the existing claims as staked on the ground, was carried out by the defendant General Beryllium Corporation under the direction of the defendant Robert Ford at an actual cost of $10,970.00. The said claims so overstaked by defendant General Beryllium Corporation were located in its own name and identified as G.B.C. claims. The notices of locations of said G.B.C. claims did not state that, in part or in whole, they were subject to the provisions of the basic contract. By letter dated October 21, 1961, plaintiff Moody, by his counsel, brought this omission to the attention of defendant General Beryllium Corporation, through its counsel. By letter dated October 25, defendant General Beryllium Corporation, by its counsel, responded in part as follows:

"You are advised that the failure of General Beryllium to insert this provision in the location certificate arose from the fact that so large a number

of the claims were in such unsatisfactory condition that the work of amendment and relocation was much more drastic and extensive than had been contemplated and that, in many instances, no one could determine whether or not a particular location was covered by the locations concerned in the main contract. You are advised, however, that, with respect to claims located by it in its own name, General Beryllium intends in no way to detract from the rights held by the several parties under the contract between it and Mr. Moody and that, in all such locations, those rights to which any of such parties are entitled under the provisions of that contract will be honored by General Beryllium."

8. The contract further provided that $30,000.00 should be paid on and in the event of the exercise of the option set forth therein. The sum of $30,000.00 was paid to Moody in December, 1961. The total amount paid by the defendant General Beryllium Corporation to the plaintiff Moody under the contract was the sum of $48,900.00.

9. The area covered by the G.B.C. claims falls into three categories: (a) That entirely outside the periphery of the property covered by the basic contract; (b) that partly within and partly without such periphery; and (c) that entirely within such periphery. The plaintiffs make no claim by reason of the contract to property in category (a). Except for an overriding royalty interest asserted by the defendant Ford, the defendants make no claim to property in category (c).

10. The contract further provided in Paragraph V that the grantee had the right to abandon any of the claims herein concerned at any time. By notification to the plaintiff Moody of May 22, 1962, the defendant General Beryllium Corporation abandoned the 50 claims covered by the Shurtz lease of April 17, 1961, and by notifications to Moody of May 29, 1962, defendant General Beryllium Corporation abandoned: (i) The mining claims known as the Teapot, Teapot Nos. 1 to 5 inclusive, Hot Days 8, 10 and 12, and the Boone claims Nos. 1 to 36 inclusive; (ii) the mining claims known as the Bluebell 1 to 24, inclusive, Yellow Bird 1, Lucky Windy 1 to 15 inclusive, and Sparks 1 to 16 inclusive; (iii) the claims covered by the Sanderson-Christensen lease of August 16, 1960, and the premises covered by the State of Utah Mineral Lease 16049, and (iv) the claims known as Popcorn 1 to 9 inclusive, and Locus 1 to 7 inclusive.

11. The contract provided in Paragraph X that in the event of abandonment of all or any part of the property by the grantee that the grantee agreed to deliver to the grantor at the time of such abandonment basic exploration data obtained from exploration work conducted by it and consisting of drill hole locations, drill hole logs and assay results, if any. Under date of June 2, 1962, the plaintiff Moody served notice upon the defendant General Beryllium Corporation requesting basic exploration data obtained from exploration work conducted by it. The defendant General Beryllium Corporation has failed to this date to supply any such information.

12. Paragraph numbered I.B.5. of the contract provided as follows: "The remaining $940,000.00 shall be paid in semi-annual payments of $25,000.00 each, payable in advance on or before the 15th day of January and the 15th day of July of each year, commencing with the 15th day of July, 1962. In event that any installments shall not have been paid when due or thereafter within 20 days after written demand made by the grantor the grantor at his option may declare the default and re-enter upon the premises and resume possession of each and every part thereof and all rights of the grantee in and to the property save for removal of its property and installations as hereinafter provided shall absolutely cease and all payments theretofore made shall remain the property of the grantor."

13. The defendant General Beryllium Corporation failed to pay the sum of $25,-000.00 due and payable on the 15th day

of July, 1962. Pursuant to the foregoing provisions and under date of July 16, 1962, and in strict compliance with the notice requirements of said Paragraph I.B.5. plaintiff Moody served notice of demand for payment of the said $25,000.00 due on July 15, 1962, and gave notice that if the same were not paid within 20 days as provided by the contract, Moody would declare the contract in default and re-enter upon the premises described in the contract and resume possession and that all rights of defendant General Beryllium Corporation, save for the right of removal of its property, would absolutely cease. Defendant General Beryllium Corporation failed to make the said payment within said 20 day period. Under date of August 8, 1962, notice was served on General Beryllium Corporation that the plaintiff Moody had not received the sum of $25,000.00 as provided in the contract and that he had exercised the option granted under the contract and declared the contract in default and terminated and that he had re-entered upon the premises and resumed possession of each part thereof and that all the rights of General Beryllium Corporation had ceased and come to an end, save the right of removal of its property as provided in the contract.

14. At the time that said notices were given to General Beryllium Corporation the defendant Robert Ford was not in possession of the property and no notice, actual or constructive, had been given to the plaintiff Moody that the defendant Ford asserted an interest in the premises.

15. The plaintiff Moody resumed possession of the premises covered by the contract and no further sums have been paid by General Beryllium Corporation under the contract and no tender or offer of sums has been made.

16. The defendant General Beryllium Corporation expended approximately $100,000.00 in exploratory drilling upon the mining claims subject to the basic contract and expended additional sums for the services of geologists. No structures, shafts or excavations were constructed upon the property and all of the expenditures of the defendant General Beryllium Corporation upon the property were directed toward exploration and development of information relating to mineralization of the property. No part of the basic exploration data or information has ever been made available to the plaintiff Moody. By written agreement between the defendant General Beryllium Corporation and the defendant Ford, Ford was committed to secrecy and agreed that he would not divulge any information whatsoever about the property. The plaintiff Moody has thus far received no substantial benefit from the work performed upon the property by the defendant General Beryllium Corporation.

17. Under date of May 15, 1962, an instrument entitled "Agreement" was entered into between the defendants General Beryllium Corporation and Robert Ford, doing business as Robert Ford and Associates, by which General Beryllium Corporation undertook to grant to Ford certain overriding royalty interests in the premises covered by the basic contract. Under date of February 1, 1963, General Beryllium Corporation executed and delivered to the defendant Ford an instrument entitled "Deed" purporting to grant to Ford the outside portions of certain of the G.B.C. claims. The rights of Ford under the agreement of May 15, 1962, and the deed of February 1, 1963, are derived from General Beryllium Corporation under the basic contract and depend for their validity upon the rights of General Beryllium Corporation under such contract. The plaintiff The Anaconda Company under date of January 2, 1963, entered into an option agreement with the plaintiff Moody covering the premises here involved. Such option has not been exercised but is now in force and effect, and plaintiff The Anaconda Company is now in possession of the premises covered by the option agreement.

18. There remains for consideration the issue relating to the ownership as between Moody and General Beryllium Corporation of the outside portions of

those G.B.C. claims which are located partly within and partly outside the periphery of the claims covered by the basic contract as such claims were staked on the ground.

19. As seen from the foregoing findings there were originally 266 claims covered by the basic contract. Of these claims, General Beryllium Corporation abandoned 208, leaving subject to the contract at the time of termination only 58 claims. These 58 claims (except 2 Hot Day claims) are all covered by the Rawlinson-Peterson lease, and insofar as this case relates to the problem of ownership of property outside of such periphery, it relates to the claims covered in the Rawlinson-Peterson lease.

20. The curative procedure adopted by General Beryllium Corporation for "improving and perfecting the title to the * * * claims concerned" was not within the particular contemplation of the original contract covering "amendment, relocation, or adjustment of boundaries" or the "location of fractional claims". However, plaintiff Moody and defendant General Beryllium Corporation mutually contemplated that such relocative work would be subject to the terms of the basic contract insofar as it affected lands covered by claims enumerated in the basic contract. It appears that the defendant General Beryllium Corporation at least by the time it wrote its letter of October 25, 1961, to the effect that at the time of the blanketing of the claims "no one could determine whether or not a particular location was covered by the locations concerned in the main contract", contended or assumed that that portion of the claims lying outside of the periphery of the basic claims would not be impressed with the plaintiffs' interest under the contract. It is of course possible that upon the receipt of this letter the plaintiff Moody understood that the quoted portion related to claims wholly outside of the periphery of the basic claims. Yet it seems probable that he must have then realized that General Beryllium Corporation sought to protect a position that the portion of the claims lying partly outside of the periphery belonged to it in any event. The failure of both parties to bring the problem to a head at that time is explainable at least in part by the facts that they then contemplated that ultimately title would be acquired by General Beryllium Corporation anyway, particularly if the property became valuable enough to make the problem an urgent one.

21. At the time the basic contract was entered into much of the area lying immediately outside of the periphery of the claims covered by the contract was unlocated, and presumably it was not considered of great prospective value. At the time the contract was entered into it was not therein specified, nor was it contemplated by the parties, that the defendant General Beryllium Corporation would be precluded from locating claims on its own account and for its own benefit immediately outside the periphery of the claims covered by the contract; nor was it specified or contemplated that the plaintiff Moody would be precluded from so doing.

22. The "periphery" of the claims as referred to in the basic contract and also as contemplated by the parties in the light of the subsequent agreement concerning the blanketing of the basic claims by G.B.C. claims is found and determined by the court to be the exterior boundaries of each group of claims referred to in the basic contract; and where, as between any two groups of such contiguous claims the area was so insubstantial or minor in relation to each of such groups and their relative locations as to render it unreasonable that they be separated by intervening rights, it was in effect provided and understood that the periphery in adjustment of said boundaries include such intervening area as marked or included in the G.B.C. claims. Thus it must have been contemplated that guided by reason and the practicalities of the situation, but within the spirit of the contracts of the parties, boundaries would be adjusted or relocated or fractional claims established to completely and validly claim the area within such

periphery and to afford that area the complete protection of such amendment, relocation and adjustment of boundaries and location of fractional claims. As a practical and reasonable matter within this concept the entire area of the G.B.C. claims lying immediately between the North Winds and South Winds groups, and that isolated portion of G.B.C. claims 70, 72, 111 and 112 (Filler #7), must be deemed to be within said periphery, and no other portions of the G.B.C. claims lying outside of the area of the basic claims as marked on the ground. The court finds that there were and are adequate markings on the ground to delineate said periphery, and the foregoing definition is intended to be utilized herein when said periphery is referred to.

23. It was further contemplated by the contract between the parties as originally formulated that the amendment, relocation and readjustments of boundaries and location of fractional claims within the periphery would be to protect and preserve the property of the plaintiff Moody and that of the underlying lessors including Rawlinson, as well as the interests of General Beryllium Corporation as derivative therefrom. The defendants concede, as defendants have asserted, that under the revised procedure involving the blanketing of such claims, plaintiff Moody was entitled upon forfeiture of the contract to be placed in substantially the same position as he would have occupied had the curative work upon the claims been accomplished by amendment, relocation and adjustment of boundaries, and that Moody should not be prejudiced or his rights impaired by the return to him of the premises covered by claims which were the subject matter of the original contract. This seems generally in accordance with the finding and understanding of the court in practical effect and yet it seems more accurate to think, and the court specifically finds in view of the revised procedure that it was contemplated and agreed by the parties, irrespective of the exact situation which would exist with respect to the portions of claims lying outside the periphery, that the plaintiffs' rights within the periphery in case of forfeiture should be supported, sustained and validated by such benefits and advantages as would reasonably inure to them as a result of the blanketing procedure, even though advantages operative within the periphery might relate or be inherent in the portions of the straddling claims lying outside the periphery. Thus the defendant General Beryllium Corporation, having adopted the blanketing system in agreement with the plaintiff Moody for the purpose of perfecting the basic claims within the periphery, was, and continues to be, under the contractual duty to accord to the plaintiff Moody and those holding under him such protection and preservation of property rights within the periphery as might be incident to the location and maintenance of the entire claims straddling the periphery. For reasons more fully hereinafter stated, however, the court finds that in order to fulfill such duty and to support such claims within the periphery, the entire forfeiture or relinquishment by defendants of their separate interests in the portions of the claims lying outside of the periphery is not reasonably essential. In other words, the original contract contemplated that around the exterior boundaries of the premises there would be amendments and relocations of claims and adjustment of claim boundaries involving the preservation of the identity of the claims covered by the basic contract and further contemplated that where made necessary by such relocation or amendments or surveys, fractional claims would be created inside the periphery. In view of the blanketing system later adopted, however, it would be inequitable and contrary to the subsequent agreement of the parties that plaintiffs should be remitted only to such rights if any as they might salvage or re-establish on the basis solely of the initial locations as they might have been relocated, amended or re-established.

24. Plaintiffs contend that the only way to preserve their rights and interests

in the area within the said periphery is to award to them completely all of the claims which lie partly within and partly without the periphery. This would of course not only give them the protection and benefits of the blanketing system within the periphery, but would give to them independent and separate rights in all of the minerals found in the portion of the claims outside of the periphery. It is probable that such additional rights would be and are substantial as to some claims. It would be inequitable, unjust, contrary to the contemplation of the contract between the parties, and contrary to the policy of the law for such additional rights to be awarded to the plaintiffs, unless such award be indispensable to the protection of plaintiffs' proper interests within the periphery aforesaid.

The plaintiffs contend that the fragmenting of the claims by recognition of the boundary between the parties along the periphery would deprive the plaintiffs of the benefits of the curative work agreed upon and of valuable rights within the periphery. It is said that this would render the end lines of the affected claims nonparallel and would thus preclude extralateral rights and the pursuit of lode or vein outcroppings within the sidelines even though such pursuit might extend into the property of another. It is also asserted that the requirements of the mining laws imposed upon the locator of a mining claim certain requirements with respect to the discovery of minerals and the performance of certain acts with respect to the location of boundaries in the erection of discovery monuments. In respect of these it is asserted that plaintiffs' interest could be affected if they are not granted all of the interests of defendants in the portions of the straddling claims outside of the periphery.

In view of the agreement of the parties involving the new system of blanketing, it seems to the court that the defendant General Beryllium Corporation did not necessarily become a guarantor that the system would be equally or more effective than the system specified in the contract, but it did undertake the responsibility of according to the plaintiff Moody the benefits of the new system to the full extent that they would support and validate the claims to the area within the periphery of the basic claims. Plaintiff Moody did not necessarily abandon any rights which he may have had by reason of the original locations; the defendant General Beryllium Corporation undertook through the new procedure to sustain the rights of the parties within said periphery to the full extent the new procedure reasonably would permit.

25. To premise the forfeiture of the defendants' otherwise valid claims outside of the periphery upon problems with reference to the discovery of minerals and the location and erection of discovery monuments would involve matters concerning which there is little or no evidence in the record. At best such forfeiture would be based upon speculation. The parties stipulated that there would not be involved in this action the question of the validity of the claims and as a result little or no evidence was offered concerning discovery or discovery monuments. Nor is there any proof that there are any lodes or veins upon the straddling claims within the periphery which might involve the problem of extralateral rights to pursue a lode or vein beyond the periphery.

Moreover the area of the G.B.C. claims 62, 63, 64, 65, 67, 68, and 245, and perhaps other claims within the periphery of the Horn Claims is so small that to predicate partial or total ownership of these claims on the accident of the slight impingement would be especially inequitable. Aside from the possible application of the principle of de minimis, the question of mineralization or lack of mineralization on the respective portions again could invoke that doctrine even though territorial impingements would be substantial.

26. The suggestion of the defendant General Beryllium Corporation that the parties be considered tenants in common in proportion to the area of the claim ly-

ing outside and within the periphery is not considered feasible, reasonable nor lawful. It would involve the necessity of the joint operation of the particular claims by the parties or the assertion of the operating rights of a tenant in common, contrary to the contemplation of the parties under the original contract. It could involve a most inequitable division of property rights since such a solution would be based upon area independent of mineralization or mineral values. Tenancy in common under Utah law could lead to the partition of the interests of the respective parties with still different criteria or standards to be applied, and bearing no necessary relationship to the contracted relationship of the parties.

27. General Beryllium Corporation has denied to plaintiff Moody the information which it obtained with respect to its drilling and basic exploration. It is possible that drilling in certain cases was conducted by General Beryllium on the portion of the G.B.C. claims which lies outside of the periphery or discovery was otherwise relied upon outside the periphery to support the straddling G.B.C. claims. If such drilling or discovery were the basis on which a claim for discovery rested, Moody upon the severance of the G.B.C. claims, might be obligated immediately to undertake drilling, with resulting necessary costs, on the inside portion of the claim. If drilling has been conducted by General Beryllium Corporation upon the outside portion of any G.B.C. claim, and the outside portion were severed, Moody's benefit from such drilling would be limited and restricted. There is no express contractual obligation of General Beryllium Corporation to divulge or deliver to Moody any information or data except in the event of abandonment and General Beryllium Corporation did not abandon the General Beryllium claims or basic claims located on and adjacent to the Horn claims.

28. The underlying claims were located by Rawlinson and Peterson and were covered by a lease to Moody. Rawlinson and Peterson joined with the other parties in the amendment to these leases which amendment permitted General Beryllium Corporation to amend, relocate or adjust the boundaries of these claims. Whether Rawlinson and Peterson consented to the location of the blanketing claims as a substitute for the curative work provided in the contract is not specifically disclosed by the evidence. In any event the problems, if any, between the plaintiffs and their lessors are not before the court and would not seem to be essentially different whether the entire straddling claims are awarded to the plaintiffs or whether only those portions within the periphery are awarded to them coupled with such protective provisions or reservations concerning the portions without the periphery as may be deemed essential for the protection of rights within the periphery.

The possibilities that the award to the defendants of those portions of the claims lying outside of the periphery aforesaid will adversely affect the rights of the plaintiffs within the periphery are remote, and to an extent speculative. Such possibilities are not such as reasonably and equitably to justify the extension of plaintiffs' rights outside the said periphery but are such as reasonably and equitably to require the establishment of protective provisions in accordance with the following conclusions of law.

From the foregoing Findings of Fact, the court now makes and enters the following:

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter herein.

2. The written notices given by the plaintiff Moody to the defendant General Beryllium Corporation were effective to terminate the contract between the parties and all rights in and to the premises thereunder. The plaintiff Moody was not required to give notice under any provisions of the contract other than those provisions contained in the written notices so served and the plaintiff Moody was not required to proceed in any other manner to terminate the contract.

3. The defendant Robert Ford was not entitled to any notice of the termination of the contract.

4. The plaintiff Moody is in no way obligated to make any payment whatsoever to the defendant General Beryllium Corporation for any improvements made by it upon the premises.

5. The defendant General Beryllium Corporation by notices of May 22, 1962 and May 29, 1962, abandoned all but 58 of the 266 mining claims covered by the contract of May 15, 1961. The defendant General Beryllium Corporation was under no contractual or other prohibition or disability with reference to the acquisition of rights outside of said periphery as against plaintiffs without prejudice to Moody's rights within said periphery. As of possible interest see the late case of Opco, Inc. v. Scott, 10 Cir., 321 F.2d 471 (1963).

6. Subject to its right of abandonment the defendant General Beryllium Corporation was under a duty to protect and preserve the premises covered by the basic contract and to protect the interests of the plaintiff Moody within said periphery to the extent reasonably possible by said blanketing system in the findings referred to.

7. Under the provisions of the basic contract, except for the location of fractional claims within the periphery, the parties intended that curative work upon the claims covered by the contract should be accomplished by amendment, relocation and adjustment of the boundaries of such basic claims, with a preservation of their identity. Defendant General Beryllium Corporation in lieu of the performance of such curative work, in agreement with the plaintiff Moody blanketed the area involved with G.B.C. claims. Plaintiff Moody is entitled upon the return of the property to him to be placed substantially in the same position with respect to the area within said periphery as he would have there occupied had the entire claims straddling said periphery been awarded to him, and Moody should not be prejudiced nor the validity of the claims or portions thereof situated within said periphery impaired by the award to defendants of rights in and to the portions of said G.B.C. claims situated outside of said periphery.

8. The alternative solutions contended for by the respective parties (by plaintiffs that all of the blanketing claims lying partly within and partly without said periphery be awarded unconditionally and in their entirety to plaintiffs; by the defendant General Beryllium Corporation that the parties be declared tenants in common of said straddling claims in proportion to the areas lying outside of and within said periphery; and by the defendant Ford that the defendants be awarded unconditionally the portions of the G.B.C. claims lying outside of said periphery) are inequitable and unreasonable in one substantial respect or another, each presenting an alternative founded to a degree on speculation and unacceptable to the court.

9. The equitable powers of the court by conditional decree and by the retention of jurisdiction should be sufficient to permit the fashioning of a reasonable and equitable provision to recognize and safeguard the rights of the respective parties in spite of the peculiar and difficult situation involved in the instant action. It would be unduly restrictive and sterile under these circumstances for the court to be bound to award a remedy in order to effectuate one proper right which unavoidably would prejudice or forfeit or limit other proper rights or to withhold any remedy at all because of the difficulty of fashioning a proper one. The disposition here should be in accordance with the principle broadly recognized in Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 72 S. Ct. 219, 96 L.Ed. 200 (1952), that wise judicial administration giving regard to conservation of judicial resources and comprehensive disposition of litigation does not counsel rigid mechanical applications under the Federal Declaratory Judgment Act, and an ample degree of discretion exists on the part of the court to work out equitable solutions. Reason-

able abstention is commended or required as the case may be, depending upon whether the problems are ripe for determination, Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952), the nature and extent of the relief will be limited or fashioned in avoidance of speculative or contingent areas; courts should not declare future rights, much less present rights, in anticipation of an event which may not happen unless special circumstances appear which warrant an immediate decision, Washington-Detroit Theatre Co. v. Moore, 249 Mich. 673, 229 N.W. 618 (1930), 68 A.L.R. 105; Anno. 68 A.L.R. 110, 118, 87 A.L.R. 1205, 114 A.L.R. 1361, 123 A.L.R. 285. But it seems to follow that rights may be declared to the extent ripe for determination if they exist without reference to contingencies or if by supplemental relief or otherwise contingencies can be adequately provided for within the declaration of the final judgment. 28 U.S.C. § 2202; cf. Shumaker v. Utex Exploration Company, D.C.Utah, 157 F.Supp. 68 (1957).

10. The General Beryllium Corporation mining claims located partly within and partly outside the periphery of the mining claims as staked upon the ground identified in the contract of May 15, 1961, were located for the use and benefit of the plaintiff Moody insofar as they related or might relate to the area within said periphery. The plaintiffs and neither of them have any right, title or interest in or to any portion of the G.B.C. mining claims lying entirely outside the periphery as staked on the ground of those mining claims identified in the contract of May 15, 1961, entered into between plaintiff Moody and defendant General Beryllium Corporation; and all such portions of the G.B.C. mining claims lying outside such periphery are as between the parties under the contract the property of defendants Ford or General Beryllium Corporation as their interests may appear, subject, however, to the conditions hereinafter stated for the protection of plaintiffs' interests within said periphery; whereas all portions of the G.B.C.

mining claims lying within such periphery are the property of plaintiff Moody.

11. It is somewhat unlikely that the severance or "fragmentation" of said G.B.C. claims by the said periphery will adversely affect in actual application the severed interests hereby recognized with respect to discovery, monumentation and extralateral rights. It has been held that a deed to a mining claim in the absence of restrictive words operates to convey the lateral extension of any vein apexing within the deeded area. Midwest-Butte Development Co. v. Butte West Side Mines Co., 9th Cir., 32 F.2d 841 (1929). It has been recognized that a patent may not issue upon an application that expressly excludes therefrom the land upon which is situated the discovery shaft and improvements, and where the proof fails to show the discovery of minerals on the claimed ground. But after a claim has been properly located an owner may sell any part without prejudice of his right to hold the remainder, and this result would obtain in the event of partition. See Utah Code Annotated 1953, 78-39-12. One whose right is thus partitioned does not lose all rights merely because the original discovery was not located on his portion of the claim. See also Bingham Amalgamated Copper Co. v. Ute Copper Co., D.C.Utah, 181 F. 748 (1910), indicating in principle that unless there is intent to abandon, the rights of the plaintiffs can be protected. It is obvious from the findings herein that there was and is no intent to abandon, and plaintiffs should be treated as the prior locator with reference to all rights within the periphery of said basic claims, or the portions of the straddling claims within said periphery. Silver City Gold & Silver Min. Co. v. Lowry, 9 Utah 334, 57 P. 11 (1899).

12. As against the possibility that there could otherwise be prejudice resulting to the plaintiffs, defendant General Beryllium Corporation should be required forthwith to deliver to the plaintiff Moody all of the basic exploration information and data in the possession of or under the control of General Beryllium

Corporation, its agents, employees and servants relating to activities performed upon or in connection with the premises identified in the contract of May 15, 1961, or the G.B.C. claims declared hereby to be the property of plaintiff Moody except insofar as such information and data pertains to property forfeited by plaintiff Moody pursuant to the default in payment of defendant General Beryllium Corporation, and subject, however, to the following further conditions.

13. To the same end, as against the defendants and all those claiming under them, plaintiffs' extralateral rights, if any, based upon discovery of minerals in related veins or lodes within the portion of the said straddling claims awarded to plaintiffs, should be recognized and confirmed in plaintiffs to the same extent and degree as if the end lines of the claims intersected by the periphery were parallel to the innermost boundary of said respective claims; and, as against third parties the plaintiffs should be deemed subrogated to the rights of the defendants and those claiming under them to the extent essential to afford the same extralateral rights as against third parties.

14. To the same end, the defendants, or those claiming under them, should be required to disclose to the plaintiffs all discovery, exploration and drilling data heretofore available, or hereafter becoming available to them on or in connection with the portion of the straddling claims awarded to the defendants which affect or may affect the validity of those portions of the said straddling claims awarded to the plaintiffs; and the defendants, and those claiming under them, should be estopped and enjoined as a condition upon which they are to be awarded the portions of the straddling claims lying outside of said periphery from withholding said data, notwithstanding the provisions of the contract between the parties providing for the surrender of such data only as to claims which were "abandoned".

15. The parties are entitled to the entry of an appropriate judgment declaring and determining the foregoing principles and resolutions of right and further determining that:

(a) The contract entered into between plaintiff Moody and defendant General Beryllium Corporation under date of May 15, 1961, and all incidental and collateral contractual engagements in connection therewith are terminated and all rights of the defendants and each of them under said contract and in and to the premises covered thereby have wholly terminated and ceased.

(b) Neither the plaintiff Richard D. Moody nor the Anaconda Company has any right, title or interest by reason of the contract dated May 15, 1961, entered into between plaintiff Richard D. Moody and defendant General Beryllium Corporation to the area covered by G.B.C. mining claims lying entirely without the periphery of the underlying claims covered by said contract and as staked on the ground.

(c) Neither the defendant General Beryllium Corporation nor Robert Ford has any right, title or interest in or to any portion of those G.B.C. mining claims which lie entirely within the periphery as staked on the ground of those mining claims identified in the contract of May 15, 1961, entered into between plaintiff Moody and defendant General Beryllium Corporation, and all such G.B.C. claims, as between the parties are the property of plaintiff Moody.

(d) That plaintiffs' rights and interests in those portions of the said straddling claims which lie partly within said periphery should be safeguarded and protected as hereinabove indicated as a condition of awarding defendants the residue of said straddling claims.

16. That the court should reserve jurisdiction to grant further or supplemental relief in application and implementation of the rights and obligations herein declared, and also to grant further declaratory relief in furtherance of the principles herein recognized.

17. That each party in the above entitled cause should bear its or his own costs.

18. Plaintiffs are hereby directed to prepare and serve upon opposing counsel within ten days a proposed judgment in accordance with the principles and dispositions indicated in the foregoing Conclusions of Law, and the defendants are allowed one week within which to prepare and submit a proposed judgment in accordance with such principles and dispositions if defendants are not content with the submission of plaintiffs; it being understood that all parties reserve their exceptions to the court's substantive determinations without waiver by the submission of proposed forms of judgment in accordance herewith. The settlement of the judgment, together with any arguments with respect to the basic conclusions and principles adopted by the court, is set for the 20th day of December, 1963, beginning at 2 o'clock P.M.