**RANCHERS EXPLORATION AND DE-VELOPMENT CO., a New Mexico corporation, Plaintiff,**

v.

**The ANACONDA COMPANY, a Montana corporation, Topaz Beryllium Company, a Utah corporation, W. T. Hudson, Lenard Rockwell and M. G. White, Defendants,**

Homer U. Petersen, Phill Rawlinson and Richard D. Moody, Intervenors.

No. C 15–63.

United States District Court
D. Utah,
Central Division.

Dec. 22, 1965.

Calvin A. Behle, of Parsons, Behle, Evans & Latimer, H. Byron Mock and Kent Shearer, of Neslen & Mock, Salt Lake City, Utah, for plaintiff.

S. N. Cornwall and Clifford L. Ashton, of VanCott, Bagley, Cornwall & McCarthy, and Robert G. Dwyer, Salt Lake City, Utah, for defendants The Anaconda Co. and Topaz Beryllium Co.

Thorpe Waddingham and Dudley Crafts, Delta, Utah, for defendants Lenard Rockwell and M. G. White, and for intervenors.

CHRISTENSEN, District Judge.

The jurisdiction of this court properly has been invoked upon the basis of diversity of citizenship existing between the parties.

Defendants and intervenors [1] are the claimants of numerous lode mining claims spread across an area of more than five square miles of public domain lying on the west flank of Spor Mountain in Juab County, Utah. Over some of these claims plaintiff Ranchers Exploration and Development Co. attempted to locate claims of its own and to make mineral discoveries in support of such relocations. Defendants forcibly prevented the consummation of these attempts. It was then believed, and it since has been confirmed, that a major beryllium [2] field was involved within which numerous claims are highly valuable.

Plaintiff alleged [3] that defendants, having themselves made no valid mineral discoveries, unlawfully interfered with its established rights in particular mining claims on which it had initiated locations and was in the process of making discoveries, and through conspiracy and otherwise violated its right to make further locations and discoveries, for which interference and violations plaintiff sought injunctive, declaratory and legal relief, including that afforded by the

---

1. While defendants and intervenors claim rights in severalty and defendant The Anaconda Company with options from the others was the active participant among them in bringing the conflict between the parties to a head, all of the defendants and intervenors take essentially the same position in the case and, as "defendants", frequently will be referred to collectively in indicating contentions, positions or activities of one or more of them.

2. Beryllium was discovered in 1798 in Beryl by L. N. Vanquelin. It is a metallic element belonging to the alkaline-earth fam-

ily. It may be alloyed with many other elements, is quite hard and is one of the lightest of the metals, the specific gravity being 1.85 as compared to 1.75 for magnesium and 2.7 for aluminum. Having also a high resistance to heat and corrosion, its usefulness in aviation and space programs, as well as in other ways, has greatly increased interest in it. See Occurrence of Nonpegmatite Beryllium in the United States, 318 U.S.Geol.Survey Prof.Paper 1, 2 (1959).

3. The complaint now before the court is an Amended and Supplemental Complaint filed February 11, 1964.

Sherman Antitrust Act, 15 U.S.C. §§ 1, 15, and comparable state statutes.

Defendants denied plaintiff's assertions that their claims were not supported by valid mineral discoveries at the time of plaintiff's entries; and defendants alleged that to the extent of any failure in this respect they were entitled to protection in the continued occupation, exploration and perfection of their claims under the doctrine of *pedis possessio*. Defendants asserted that in any event plaintiff was precluded or estopped from questioning or interfering with their rights by reason of conduct on the part of one Ford, with whom plaintiff was associated in the investigation and attempted acquisition of defendants' claims and to whom plaintiff later assigned an interest in any recovery from this lawsuit.

During pre-trial proceedings, in the hope of avoiding unmanageable processing for trial of numerous individual claims, six "bellwethers"[4] were selected by the parties (three claims by each side) as presenting the major issues of fact and law likely to be encountered in deciding the validity of all of the claims in dispute. Accordingly, the trial upon which the present decision is based was confined to an investigation of these six claims and the rights of the parties concerning them. The position of the hundred or so other claims which could be affected by the ruling and all issues as to antitrust problems and damages, to the extent their consideration may become necessary, have been by agreement reserved for further proceedings.

The wide latitude which the briefs have encompassed has been helpful in permitting us to beat peripheral bushes for obscure conceptual traps. But with that done, the scene of conflict has returned to the broad but variable slopes of established principles. A discussion keyed primarily to the minutia of facts set out in the extended findings proposed by some of the parties or the plethora of comments in the decided cases, would serve only to mask the decisive points. Their solution turns not upon questions of credibility, nor upon nice distinctions in fact or law, but primarily upon the reconciliation or adjustment of competing public policies and foundational legal principles as they met head on, so to speak, during those bleak winter hours of 1963, when the armed guards of the defendants sought out, and with force turned back from the properties in dispute, the plaintiff's scrambling personnel and equipment.

From the maze of factual and legal matters which it is hoped have been adequately, if not from the standpoint of all of the parties satisfactorily, covered by the pre-trial rulings and order and by the findings of fact and the conclusions herein recited, three problems seem to warrant more extended discussion in view of their importance in the mining industry.

The first vital inquiry is whether defendants or their predecessors in interest had made "mineral discoveries" on or underlying all of the bellwether claims prior to the attempted entries by plaintiff. If so, all issues would have to be resolved in favor of defendants, for even as to its antitrust implications plaintiff concedes that such a finding, if sustainable, would be determinative against it on the whole case. If *discovery* previously had not been accomplished on or underlying all of such claims, defendants would be relegated to their defenses of *pedis possessio* and *estoppel* or *"unclean hands"*, thus presenting the second and third major issues to be examined here: Whether defendants at the time of plaintiff's attempted entries were in occupation of and diligently attempting to make

4. From sheepherding experiences of distant years it was recalled that bells were hung on part of the herd, frequently the more active or "breachy" sheep which were thought to be the wethers, for possible assistance in locating straying bunches or to aid in a field count. The term "bellwethers" was adopted by common consent in this proceeding to designate the six "belled" claims through which it was hoped the rights of the parties could be "located" or "counted".

discovery on the claims on which mineral discoveries had not been made, within the doctrine of *pedis possessio*; and, if not, whether plaintiff by reason of any unconscionable conduct attributable or imputable to it should be barred from asserting whatever rights it might otherwise have possessed.

The bellwether claims are these:

*Monitor No. 43.* This claim was drilled by the defendant Topaz Beryllium Company in 1962. Substantial beryllium was encountered in the hole at between 400 and 500 feet in depth. No competing entry or discovery had been attempted by plaintiff, which at the trial disclaimed any interest.

*South Wind No. 29.* This claim is adjoined on the north by South Wind No. 30, on the east by South Wind No. 17 and on the south by South Wind No. 28, and is overlaid by G.B.C. (General Beryllium Corporation) Nos. 78, 80, 115 and 116, all being located by predecessors in interest of the defendants.[5] The entire surface of this claim is barren of any exposed mineral or rock in place, being covered by alluvium. Prior to 1963 Ford, then working for General Beryllium Corporation, drilled a hole within South Wind No. 17, which was also within G.B.C. No. 78, and approximately 25 feet from the boundary of South Wind No. 29. Samples from this hole showed significant beryllium content. Outcroppings and surface geology to the northeast made it reasonable to infer that beryllium likely would be encountered at some depth on South Wind 29. Moody was entitled to the benefit of any information Ford or G.B.C. had concerning discoveries near or on these claims. On January 21, 1963, after they had prevented plaintiff from entering this general area, defendants drilled a hole on South Wind No. 29, which encountered beryllium bearing tuff

at shallow depth. Up until the latter hole was drilled, no physical work had been done on the claim by either defendants or plaintiff, except for staking, monumenting and posting by the former. No one maintained physical possession of the claim. In January, 1963, however, Moody, at the request of Anaconda, assigned his employee Atkinson to go on occasion to the general area for the purpose of watching and, as needed, restoring claim boundaries and re-erecting monuments on the Rawlinson-Moody groups of claims. Air surveillance for possible intruders was also carried on about the time of plaintiff's entry in January, 1963, with reference to this and the other areas mentioned hereafter.

*Hat No. 4.* The plaintiff attempted through its agents to locate this claim in the nighttime of January 18, 1963, but was forcibly prevented by defendants from so doing after the digging of a pit for the location monument was commenced. The intended claim was covered by alluvium, there being no outcroppings except occasional limestone on the surface of the claim. At the time of plaintiff's entry the hole on South Wind No. 17, mentioned above, had been drilled, and thus the latter claim was supported by a valid discovery inuring to defendants. A small part of South Wind No. 17 overlapped the intended location of Hat No. 4. In view of surface geology to the northeast and the mineralization encountered in this hole the likelihood of beryllium bearing tuff underlying a portion of Hat No. 4 reasonably could have been inferred.

*The Larry Claim.* The intended boundaries of this claim brought it in conflict with portions of defendants' South Winds Nos. 2, 9 and 10, and G.B.C. Nos. 42 and 43. The surface of The Larry Claim is alluvium except for a rhyolite exposure

5. Intervenor Rawlinson originally staked the claim and leased it to Moody who in turn conditionally transferred it, together with numerous other claims, to General Beryllium Corporation, herein referred to as G.B.C. G.B.C., not being satisfied with the staking of the South Wind claims by Rawlinson blanketed them with G.B.C. claims. G.B.C. later forfeited its agreement with Moody for non-payment of the stipulated consideration, forfeiture being upheld by this court. See Moody v. General Beryllium Corporation, 224 F.Supp. 934 (D.C.Utah, 1963).

in its northeast corner. There are also such exposures present on some of the overlapping South Wind and G.B.C. claims. Prior to 1963 Ford, acting for G.B.C., drilled a hole on South Wind No. 3 which revealed indications of fluorite, but no tuff nor beryllium was encountered. No further drilling on or in the vicinity of this claim was attempted by defendants until after plaintiff's entry. Location of and discovery on The Larry Claim was attempted by agents of the plaintiff on February 8, 1963. The location monument was placed and digging ostensibly for beryllium was commenced with pick and shovel during the morning; thereafter plaintiff's drill rig arrived at the location and commenced drilling at the location point, and thereupon the corner monuments were set and the location notice posted. Then the agents and armed guards of the defendants came upon the scene, disabled plaintiff's drill rig and forcibly ejected the agents of plaintiff and their equipment from the claim. Except for such action and the location of underlying claims, the record does not indicate that defendants maintained physical possession of the area of The Larry Claim at the time of or prior to the plaintiff's entry. After the eviction of plaintiff, however, Anaconda drilled holes on each of the underlying South Wind claims and encountered significant beryllium mineralization.

*North Wind No. 14.* This is a claim adjoined by North Wind No. 15 on the north, North Wind No. 4 on the east, North Wind No. 13 on the south and Monitors Nos. 15 and 6 on the west. Conflicting with the claim on the west end are Monitors Nos. 15 and 6. The claim is also overlaid by G.B.C. Nos. 13, 14, 21 and 22.[6] Except for staking, monumenting and posting related maintenance, and occasional inspection or mapping, no physical work had been done on this claim and possession had not been maintained. Approximately half the surface of the claim is rhyolite, none of which contains any beryllium. There was a major fault trend which geologists reasoned would pass through the general North Wind claims area, but without specific reference to North Wind No. 14. Geologists prior to January 1963, including Ford in his work for G.B.C., had cause to and did recommend that further money be spent in the exploration of this area. Such recommendations were made without reference to any specific claim in the vicinity and were not acted upon with reference to North Wind No. 14, nor as to adjacent claims until the fall of 1963 when a hole was drilled by Anaconda on North Wind No. 14. At 942 feet and continuing below to the terminal of this hole at 990 feet beryllium bearing tuff was encountered. Plaintiff itself did not enter this specific area. Its forcible eviction by the defendants from other claims and from the entire area with an indication that further entries would not be permitted prevented the plaintiff from attempting locations and discoveries on or in the vicinity of this claim.

*Discovery 7.* This claim was a projected location only for which a notice had been prepared for use in the field in connection with plaintiff's first entry of January 12, 1963. As thus proposed, this claim would have been in conflict with North Wind Nos. 3, 4, 13 and 14, and G.B.C. Nos. 12, 13, 22 and 23. Plaintiff

6. As is the case with other similar conflicts of overstaking, and certain irregularly or illegally sized claims, these conflicts have been deemed immaterial in the resolution of the issues now before the court. Subject to any rights of plaintiff, defendants have succeeded to any and all rights in connection with the location of, or discoveries upon the North Wind, South Wind, G.B.C. and Monitor claims. While plaintiff has raised the problem of whether defendants' discovery upon an overlaid or conflicting claim would support rights upon an overlying claim, or vice versa, the situation of the bellwethers does not turn upon this point. As a practical matter a discovery on one overlying or overlaid claim has been accepted as validating either, and there is no showing before me which would permit a finding, and I have made none, that defendants or their predecessors intended to abandon either for the benefit of third parties. Time enough if and when further proceedings become necessary to rule upon the point.

intended to locate, take physical possession of and to drill upon this claim on the morning of January 13, 1963. This intention was frustrated in the first instance by the service upon it of a temporary restraining order of a state court and after the vacation of this order on January 18, 1963, by the action of armed guards employed by the defendants in physically preventing plaintiff's agents from entering the area. About 80% of the surface of the claim is covered with rhyolite and the balance with alluvial material. No drilling or other physical work had been done by any of the defendants on the area of this projected claim prior to plaintiff's intended entry, and no occupancy of the underlying claims had been maintained by defendants, aside from previous staking, monumenting and posting, some repairing of this work, and occasional mapping and inspection of the general area. A hole was drilled by defendants upon North Wind 14, a part of which claim underlaid Discovery No. 7 in the fall of 1963 and beryllium in significant but less than commercial concentration was encountered.

## I.

■ It is the policy and requirement of law that, except as otherwise provided, all valuable mineral deposits in lands belonging to the United States shall be open to exploration under regulations prescribed by law, and to the extent consistent therewith according to local customs or rules of miners in the several mining districts.[7] A prospector has a statutory right to enter upon unoccupied public land in good faith to search for minerals [8] unless the land is held by another with superior rights. A mineral discovery upon a claim is the *sine qua non* for its validity; and although location of boundaries and monuments upon the ground may precede discovery or discovery may precede such location so long as intervening rights are not affected,[9] it is essential to validate it that a mineral discovery be within the limits of the claim located.[10] Discovery of mineral upon one claim in and of itself will not support rights to another claim or group of claims, even though contiguous.[11] To constitute a mineral discovery, something more than conjecture, hope or even indication of mineralization is essential; there must be for a lode claim discovery within rock in place of mineral having actual or potential value or of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means on the particular claim, with a reasonable prospect of success in developing a valuable mine.[12] And while liberality in applying these rules will be indulged in determining

7. Creede & C. C. M. & M. Co. v. Uinta T. M. & T. Co., 196 U.S. 337, 25 S.Ct. 266, 49 L.Ed. 501 (1905); 30 U.S.C. § 22; Davis v. Nelson, 329 F.2d 840 (9th Cir. 1964); 1 American Law of Mining § 4.7 (1964).

8. Duguid v. Best, 291 F.2d 235, 239 (9th Cir. 1961).

9. Union Oil Co. of California v. Smith, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919).

10. Ibid.; Creede & C. C. M. & M. Co. v. Uinta T. M. & T. Co., 196 U.S. 337, 25 S.Ct. 266, 49 L.Ed. 501 (1905) supra; Cole v. Ralph, 252 U.S. 286, 40 S.Ct. 321, 64 L.Ed. 567 (1920); 30 U.S.C. § 23; 40–1–1 Utah Code Annotated (1953); 1 American Law of Mining § 4.13 (1964); 1 Barringer and Adams, The Law of Mines and Mining in the United States, 214 et seq. (1897); 2 Lindley, Mines § 335 (3rd Ed. 1914); Ricketts, American Mining Law § 591 (3rd Ed. 1931); 1 Snyder, Mines and Mining § 340, 354 (1902).

11. Michael v. Mills, 22 Colo. 439, 45 P. 429 (1896); Harrington v. Chambers, 3 Utah 94, 1 P. 362 (1882), aff'd 111 U.S. 350, 4 S.Ct. 428, 28 L.Ed. 452 (1884). Compare rule concerning annual assessment work: 30 U.S.C. § 28 et seq.; Parker v. Belle Fourche Bentonite Products Co., 64 Wyo. 269, 189 P.2d 882 (1948).

12. 2 Lindley, Mines § 336 (3rd Ed. 1914); Iron Silver Min. Co. v. Mike & Starr Gold & Silver Min. Co., 143 U.S. 394, 430, 12 S.Ct. 543, 36 L.Ed. 201 (1892); Chrisman v. Miller, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770 (1905); Rummell v. Bailey, 7 Utah 2d 137, 320 P.2d 653 (1958).

superiority of rights as between private claimants,[13] and there may be taken into account the geological indications and other discoveries in adjacent areas,[14] as well as utilization made of developing technological aids,[15] these of themselves may not be substituted for discovery of minerals within the exterior boundaries of the claim in question, as that discovery may be so aided.[16] Otherwise, established public policy for the promotion of mineral resources through recognition of diligence as distinguished from speculation or monopoly could be frittered away and an express statutory requirement nullified without the comprehensive congressional re-evaluation and re-direction that seem especially requisite in this field for any such basic change.[17]

A valid discovery had been made on Monitor No. 43, and this is not now questioned by plaintiff. Considering the liberal rules for mineral discovery as between private claimants, and applying established principles to the facts in the contemporary setting, I find that mineral discovery also had been made by defendants on South Wind No. 29 and underlying Hat No. 4, but that on or underlying The Larry Claim, North Wind No. 14 and Discovery No. 7, no mineral discovery had been accomplished prior to the attempted entries of plaintiff.[18] Reasons and distinctions can best be understood and more conveniently expressed after a summary of certain background information concerning the geology of this area.

Beryllium was first discovered in the Spor Mountain area in December, 1959, when nodules of opal, gathered from the surface of the ground for cutting and polishing, were found to contain beryllium. This led Beryllium Resources, Inc., to start exploration in the Spor Mountain area, followed shortly by Vitro Mineral Corp., and a little later by The Combined Metals Reduction Corp. Beryllium-bearing tuff was thereupon discovered underneath the surface of the ground on both the east and west flanks of Spor Mountain. Numerous claims

13. Rummell v. Bailey, 7 Utah 2d 137, 320 P.2d 653 (1958) supra; Nevada-Pacific Development Corporation v. Gustin, 226 F.2d 286 (9th Cir. 1955); Erhardt v. Boaro, 113 U.S. 527, 5 S.Ct. 560, 28 L.Ed. 1113 (1885).

14. Harrington v. Chambers, 3 Utah 94, 1 P. 362 (1882) supra; Book v. Justice Min. Co., 58 F. 106 (C.C.D.Nev.1893); Cf. Shoshone Min. Co. v. Rutter, 87 F. 801 (9th Cir. 1898).

15. Rummell v. Bailey, 7 Utah 2d 137, 320 P.2d 653 (1958) supra; Dallas v. Fitzsimmons, 137 Colo. 196, 323 P.2d 274 (1958), 66 A.L.R.2d 551.

16. Rummell v. Bailey, 7 Utah 2d 137, 320 P.2d 653 (1958) supra; Union Oil Co. of California v. Smith, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919) supra.

17. See Matheson, Mineral Discovery-Requisite or Relic?, 6 Utah L.Rev. 92 (1958).

18. By reason of the broad evidences on which discovery has been sustained as to some of the claims, it has been deemed sufficient if discovery had been made on or in the immediate vicinity of any conflicting claim to render a claim of plaintiff invalid, notwithstanding that the conflict may be only partial or inexact. It has been determined to be wholly impracticable and unnecessary to further refine the findings in this respect and, indeed, because of the peculiar nature of this area it is believed that this rule of thumb must generally be applied there. We are not unmindful of Cram v. Church, 9 Utah 2d 169, 340 P.2d 1116 (1959), and Reynolds v. Pascoe, 24 Utah 219, 66 P. 1064 (1901), which in addition to indicating the invalidity of plaintiff's attempted locations where defendants already had made mineral discoveries, holds that where the point of discovery is on another valid claim the subsequent discovery is invalid. But as applied to the defendants' claims here held to be good, even though reliance has been placed upon a hole drilled on adjoining claims, the evidence of discovery upon the claims in question in view of this and other circumstances is believed adequate, as will appear more fully hereafter. In other words our case is distinguished from Cram and Reynolds because discovery on another valid claim is relied upon only as part of the evidence establishing a further and different discovery on the claim in question. Cf. Silver City Gold & Silver Min. Co. v. Lowry, 9 Utah 334, 57 P. 11 (1899).

were located by companies and individuals after the initial discoveries, including the claims involved in this action. The beryllium deposits have been found chiefly in tuff that is associated with small amounts of fluorite. The tuff is believed to be favored as the host rock because of its high porosity and permeability.

Bertrandite [19] is commonly associated with fluorite, manganese oxide minerals, montmorillonite, opal and chalcedony. It has not been found in tuff where the rock contains none of these minerals. The presence of any of these, on the other hand, does not mean that bertrandite is present. No exact correlation between the quantity of bertrandite and the quantity of any other mineral has been observed insofar as disclosed by the evidence. Bertrandite appears to be most closely associated with fluorite, since in almost all places that bertrandite occurs, fluorite also is found. The reverse, however, is not true. At Spor Mountain the high fluorine content of the rock outcroppings long has been known, which observation contributed in a general way as a useful guide to the original beryllium discoveries in 1959–1960, the purple coloration of the rhyolite being associated in popular view with the possible occurrence of beryllium below the surface. This has never been accepted, however, as an infallible, or even a presumptive guide.

Bertrandite at Spor Mountain cannot be recognized by hand specimen and cannot be predicted with any assurance by the presence of its associated minerals in the overlying rock. The beryllium content of a rock can be determined only by chemical analysis, spectrographic analysis or activation analysis by use of a beryllometer applied in close proximity to the sample. This markedly distinguishes the manner in which it may be detected from that of uranium, the presence of which can be revealed by a geiger counter from considerable distances instead of a few inches.

The beryllium deposits in the Spor Mountain area, together with the neighboring fluorspar and uranium deposits, are believed to have been formed during the waning stages of volcanism after most of the rocks of the younger volcanic group were erupted. Beryllium-bearing fluids in which the beryllium was carried as a soluble complex fluoride were derived from the magma that formed the fluorine-uranium-beryllium rich rhyolite of the younger volcanic group. These fluids rose on faults. In the vicinity of the major fluorspar deposits, the fluoride content of the fluids remained too high for the beryllium complex to break down. In the outlying regions where the fluoride content was low, beryllium was precipitated.

The general area with which we are concerned is cut by numerous faults. All probably cut the sedimentary rocks underlying the tuff and other members of the volcanic group but only a few faults cut the rocks of the overlying younger volcanic group, which is made up largely of rhyolite. In the area here involved the latter faulting is frequently concealed by overlying alluvium. There is no observable faulting in the surface exposure of the younger volcanic group on any of the bellwether claims although some are in the line of general fault trends. The rhyolite is highly resistant to erosion and in other areas of the Thomas Range it forms cliffs as high as eight hundred feet. Extending in less spectacular form to the west side of Spor Mountain, outcroppings appear from place to place in the flats. There are few, if any exposures of underlying tuff in the general area and none in the vicinity of the bellwether claims.

19. There are over 29 known beryllium-bearing minerals and 49 other minerals in which beryllium may be an accessory constituent. Of these, beryl has heretofore been the most important source of beryllium. The hydrous beryllium silicate, bertrandite $(Be_4Si_2O_7(OH)_2)$, however, is now most important in Utah and it is in this form that beryllium occurs in the Spor Mountain area. See Utah Geological Society, Guidebook to the Geology of Utah, No. 17, at 1–3 (1963).

Because the bertrandite, when it occurs, is erratic and in lens-shaped bodies, in turn located or controlled in the tuff layers when they occur, and because of the presence of the overlying younger volcanic horizons including rhyolite and generally of the Lake Bonneville alluvium, the presence of beryllium ordinarily cannot be determined with assurance by surface observance. To reveal with assurance its presence usually requires physical excavation, such as by trenching or drilling, and the assaying or other ascertainment by chemical analysis, spectrographic analysis or activation analysis of the samples obtained by physical interception. Notwithstanding this, the possibility, probability or reasonable certainty (as the case may be) of the presence underground of beryllium-bearing tuff may be inferred from geologic information, general trends and surface indications and drill hole data from surrounding areas, depending upon the totality of circumstances with respect to the particular claim involved.

I have found that there were no mineral discoveries made by defendants or their predecessors in interest on or underlying The Larry Claim, North Wind No. 14 and Discovery No. 7 prior to plaintiff's attempted entries in January, 1963. There were no drill holes encountering beryllium-bearing or other tuff on, or in the immediate vicinity of, any of these claims. There were some rhyolite exposures in a portion of The Larry Claim, and generally distributed rhyolite outcroppings on the other two claims, but I can find nothing in the evidence to justify such association of beryllium and rhyolite as to make the observation of one the discovery of the other, either in the abstract or in the context of the other evidence concerning these claims and the surrounding area. The observable surface geology and the known subsurface indications from drilling or other indications in surrounding areas yet supplied only speculative inference that beryllium would be encountered.

Aside from their implied argument that these deficiencies are not fully established factually or are not legally determinative, defendants have advanced far-reaching conceptual contentions which must be rejected if the congressional mandate concerning mineral discovery is not to be frittered away.

It is said that by reason of geological indications in the general area, discovery of underlying beryllium-bearing tuff could be inferred as to each claim in dispute. Decisions regarded as the most liberal would not countenance any such view, and by requiring confirmation of these indications by geiger count in the case of uranium, or other effective means, negate the very premise of this argument.[20] Nor can discovery somewhere within the periphery of a group of claims be accepted as validating the entire group in the absence of clear indication of locatable mineral within the particular claim in question. It is further urged that when it acquired its interest in January, 1963, The Anaconda Company was convinced by geological reports and observations, and drilling results already available from other areas that further exploration by the drilling of each claim would be justified, that a plan was in existence to accomplish just that, and that the results of the execution of such plan thereafter confirmed the conclusions which motivated the initial acquisition of the claims. What might be established through future exploration will not evidence discovery at a prior date unless the existing circumstances have amounted to a discovery.[21]

I do not question that modern methods, advancing technology and

---

20. See Titanium Actynite Industries v. McLennan, 272 F.2d 667 (10th Cir. 1960), in which the theory "that the whole mass [could] be called a lode or a vein and could be located as a lode mining claim on that basis" was held not tenable.

21. Adams v. Benedict, 64 N.M. 234, 327 P.2d 308 (1958); Cf. United States v. Iron Silver Min. Co., 128 U.S. 673, 9 S. Ct. 195, 199, 32 L.Ed. 571 (1888).

developing necessities may justifiably liberalize or, at least, permit new applications of, old principles in this field. Perhaps to an extent I have been so persuaded in reference to the two claims on which mineral discoveries have been found. But these other claims do not present any requirement for a judicial practicalization of the doctrine of discovery, should there be any such justification. Nor do they afford any reasonable basis at all for supposing that a discovery had been made. At least three foundations of defendants' position here are fallacious: the attempt to judge discovery by what was planned or accomplished in the future rather than as of the time of the competing entries; [22] the assumption that if a "lead" would justify or did motivate the prudent man to expend his further time and effort on a group of claims in an effort to effect discovery somewhere, this would validate each claim of the group even though as to any particular claim there would be no lead or evidence of discovery to substantiate, as to it particularly, the hope of establishing a paying mine, [23] and the idea that large areas of public land may be privately pre-empted and withheld from everyone else by a mere paper plan for exploration. There is no presumption of mineral discovery from the mere fact of locations, [24] nor would it seem that mere plans for the exploitation of locations could be a substitute for a mineral discovery.

Perhaps the best illustration of the error of defendants' position is the very exhibit upon which it has most strongly relied to demonstrate with respect to another area the compelling force of geologic inference—Ford's letter to Kaplan of G.B.C., dated January 31, 1962 (Exhibit B). It is true that I have attached some weight to this letter in finding that discoveries had been made on South Wind No. 29 and Hat No. 4; but, as will presently be seen, this was not an acceptance of the contention now before me. The frailty of this broader argument that the general fault trends recognized by Ford of themselves would be persuasive as an element in sustaining the three other claims, is indicated by these facts: Ford was then well informed and had no motive to withhold favorable information and G.B.C. was knowledgeable in the industry and particularly with reference to these specific areas had the benefit of most of the data upon which Anaconda acted in acquiring its interest and making its plans in January, 1963; yet Ford frankly conceded the speculative nature of conclusions that could be drawn from these trends [25] and G.B.C. on the basis of the indications which Anaconda says now should be accepted as mineral discovery on all of the claims in question and despite Ford's hopeful advice, actually abandoned its rights in the whole area by failure to make relatively nominal semi-annual payments on its contract of

22. Adams v. Benedict, 64 N.M. 234, 327 P. 2d 308 (1958).

23. Union Oil Co. of California v. Smith, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919) supra, in which discovery and assessment work in respect to group effect are contrasted.

24. Smith v. Newell, 86 F. 56 (C.C.D.Utah 1898).

25. "In answer to your letter of January 24, concerning the geology and favorable ore trends on the General Beryllium Corporation property, I take this opportunity to point these out to you. You have asked that I be specific on the geology and details regarding these ore trends. I am sure you realize by now that the study of geology is, at best, an inexact science. Our thoughts and ideas are often predicated on observations of both surface and subsurface phenomena which are often unrelated to any specific fact so presented or evidenced by any previous work. In this case, our exploration of the remaining properties has not been sufficient to detail these ore trends, but we must conclude from general observations that the possibility does exist and, of course, we are presently negligent in not attempting to delineate them by further exploration drilling.

"The ore trends on the property that I presently feel have considerable potential are enumerated as follows: * * *".

purchase from Moody.[26] To permit the pre-emption of large areas of the public domain on any such evidence would be the unwarranted judicial acceptance of speculative monopolization in lieu of mineral discovery.

Plaintiff's claims to the areas of South Wind No. 29 and Hat No. 4 are in somewhat different position. It is not unreasonable as to them to find that defendants, or their predecessors in interest, had accomplished valid mineral discoveries prior to the attempted entries of the plaintiff. The foregoing discussion of deficiencies relating to other claims will be indicative of the line of demarcation across which are the claims now under discussion. They may be hardly more than across the line but the following special circumstances convince me that their situation complies with minimal requirements for mineral discoveries as between competing claimants.

Prior to January, 1963, Ford, then working for G.B.C. drilled a hole within South Wind No. 17, which was also within G.B.C. No. 78, which encountered significant beryllium in the underlying tuff. This hole was within twenty-five feet from the east boundary of South Wind No. 29 and not materially farther away from the intended southwest corner of Hat No. 4. South Wind No. 17 on which the hole was drilled, immediately adjoins South Wind No. 29 and slightly overlaps the intended location of Hat No. 4. On the southeast corner of 17 are limestone outcroppings, which appear to have special significance in connection with the fault trend in that area. The defendants are entitled to the benefits of any discoveries made during the occupancy of G.B.C. in this area.

In view of all of the surrounding circumstances, the identification and location of the beryllium-bearing tuff on South Wind No. 17 may be deemed tantamount to its discovery upon the two contiguous claims not as a matter of mere inference or hope but as a demonstrated fact.[27] There is singularly little dispute among the experts as to the significance of the hole on 17 in connection with the general trend in that immediate area, for in addition to the conclusions of the defendants' expert at the trial, Ford's letter written to his employer G.B.C. a year prior to the time in question lends special emphasis to the testimony of defendants' expert at the time of the trial.[28] The recognized discovery of the beryllium-bearing tuff underlying the two other claims, as well as No. 17 near the boundary of which the hole was drilled is supported by the objective indications and the firm opinion of mining men and geologists, is consistent with the view that as between competing discoverers the court will not nicely weigh the extent of mineralization and will liberally apply the rules in favor of the first, takes into account the necessity of practical adaptation in view of developing conditions and yet is consistent with established public policy and basic legal principles.[29]

**26.** $25,000 each six months on account of the total balance of $940,000.00. See Moody v. General Beryllium Corporation, 224 F.Supp. 934 (D.C.Utah 1963).

**27.** Rummell v. Bailey, 7 Utah 2d 137, 320 P.2d 653 (1958); Harrington v. Chambers, 3 Utah 94, 1 P. 362 (1882); Dallas v. Fitzsimmons, 137 Colo. 196, 323 P.2d 274 (1958); Book v. Justice Min. Co., 58 F. 106 (C.C.D.Nev.1893).

**28.** In this letter, dated January 31, 1962, it was stated by Ford, among other things: "A fourth trend of possible ore-bearing tuff is indicated on the Southwind (sic) claims. This trend is evident from the outcrops and surface geology to the northeast, and is further evidenced on the Southwind claims #17 and 29, by drill hole #31–2. You may recall that this drill hole penetrated tuff someplace between 90 and 150 feet, the confusion being the similarity between the decomposed rhyolite and tuff. However, at 150 feet, the drill hole penetrated mineralized tuff containing considerable fluorite. This tuff was mineralized between 150 and 160 feet to a maximum of .31% BeO content. As I have repeatedly advised you, this is a most important drill hole * * *."

**29.** See Harrington v. Chambers, 3 Utah 94, 1 P. 362 (1882), affirmed in 111 U.S.

Each case must be decided upon its own facts; and generalizations beyond broad legal principles are dangerous.[30] Yet to supply my present idea of a possible guide, for whatever it may be worth should it ever become necessary for this court, or agreeable for the parties to apply the general views mentioned to the numerous other claims involved in this case, I have endeavored to formulate a statement of sorts. As against this statement I have also re-tested my conclusions, which may be a form of begging the question or bootstrap-lifting; yet suspect may be a subjective conclusion which cannot fall within or without some expressible proposition.[31]

May it be said that a mineral discovery has been made when one who has located or is intending to locate a lode mining claim has actually observed and identified locatable mineral as a part of rock in place within its confines, or has there observed evidences which reasonably demonstrate [32] within those confines the recognized presence of such mineral or the fact of the projection of mineral bearing ore into said claim from a contiguous claim on which locatable mineral ore has been so found or demonstrated [33] in view of the location of other known ore bodies or mines in the area, the opinion of miners, geologists and other experts, and any other information which mining operators regard as factors having a bearing upon the possibility of developing a mine on the claim in question? [34]

This statement would preclude the pyramiding of an inference upon an inference, to merely infer as to an entire group of claims mineral discoveries on each because of geological trends or other discoveries somewhere in the group of claims. On the other hand, it would recognize the futility of merely formal exploration on a particular claim when reasonably demonstrated projections from an adjacent claim establish an extending discovery, and would recognize proof accepted in practical construction by mine operators in "blocking out" ore. Such an idea in any event does not appear unreasonable in the Spor Mountain area, as a broad check upon conclusions otherwise arrived at, if not as a definitive rule.

II.

The doctrine of *pedis possessio* is succinctly and authoritatively stated in the case of Union Oil Co. of California v. Smith, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919):

"Aside from the suggested effect of the act of 1903, it is clear that in order to create valid rights or initiate a title as against the United States a discovery of mineral is essential. * * * Nevertheless, section 2319 extends an express invitation to all qualified persons to explore the lands of the United States for valuable mineral deposits, and this and the following sections hold out to one who succeeds in making discovery the promise of a full re-

350, 4 S.Ct. 428, 431, 28 L.Ed. 452 (1884), in which it was stated by the Supreme Court that "The questions raised on the admission of evidence to prove the existence and discovery of a lode by defendants were, we think, well decided, and need no further comment."

30. Titanium Actynite Industries v. McLennan, 272 F.2d 667, 670 (10th Cir. 1959).

31. This statement relates not to the essential substance of a discovery which is discussed toward the beginning of this opinion and on which more than enough has been written, but to the mode or means of its proof.

32. This demonstration may with other means be by geiger count in the case of uranium, Rummell v. Bailey, 7 Utah 2d 137, 320 P.2d 653 (1950), and Dallas v. Fitzsimmons, 137 Colo. 196, 323 P.2d 274 (1958), or by other technological aids.

33. Compare the statement in Morrison, Mining Rights 24 (6th Ed. 1936), that "Discovery means the acquirement of knowledge that a lode exists within the limits of the claim."

34. These latter factors are stated substantially in the words of Rummell v. Bailey, 7 Utah 2d 137, 320 P.2d 653, 657 (1958) supra.

ward. Those who, being qualified, proceed in good faith to make such explorations and enter peaceably upon vacant lands of the United States for that purpose are not treated as mere trespassers, but as licensees or tenants at will. For since, as a practical matter, exploration must precede the discovery of minerals, and some occupation of the land ordinarily is necessary for adequate and systematic exploration, legal recognition of the pedis possessio of a bona fide and qualified prospector is universally regarded as a necessity. It is held that upon the public domain a miner may hold the place in which he may be working against all others having no better right, and while he remains in possession, diligently working towards discovery, is entitled—at least for a reasonable time—to be protected against forcible, fraudulent, and clandestine intrusions upon his possession. Zollars v. Evans (C.C.) 5 Fed. 172, 173; Crossman v. Pendery (C.C.) 8 Fed. 693, 694; Johanson v. White, 160 Fed. 901, 88 C.C.A. 83; Hanson v. Craig, 161 Fed. 861, 863, 89 C.C.A. 55; s. c., 170 Fed. 62, 65, 95 C.C.A. 338; Gemmell v. Swain, 28 Mont. 331, 335, 72 Pac. 662, 98 Am.St.Rep. 570; New England, etc., Oil Co. v. Congdon, 152 Cal. 211, 92 Pac. 180; Whiting v. Straup, 17 Wyo. 1, 19, 23, 95 Pac. 849, 129 Am.St.Rep. 1093; Phillips v. Brill, 17 Wyo. 26, 38, 95 Pac. 856."

■ The contention of the defendants that the doctrine of *pedis possessio* can be applied upon a group or area basis rather than a claim by claim basis must be rejected, since this was the very point upon which the claim of the defendant in Union Oil Co. of California was rejected by the Supreme Court in recognition of the doctrine.[35] To say that the doctrine supports this contention is like saying that a blackbird is white, or that a yearling wether is a two-year old buck. Proposals for liberalizing the rule have been considered in the industry and studied by Congress. But even with the press of modern demands and procedures, seemingly it can be agreed upon neither in the industry nor in the Congress. It would be presumptuous, as well as unwarranted, for me to ignore the holding of the Supreme Court, with its expressed limitations. Defendants in effect, although not expressly, say that this, indeed, was done by the Circuit Court of Appeals for this circuit in Kanab Uranium Corp. v. Consolidated Uranium Mines, 227 F.2d 434 (9th Cir. 1955). I cannot think so.

Defendants specifically argue that since they are merely resisting plaintiff's attempts to gain initial possession of the areas in question and are not seeking affirmative relief for themselves in this suit, they need show neither mineral discovery upon, nor occupancy of, the bellwether claims, but had the right by force to eject the plaintiff therefrom, and are in a position to defend the suit here, merely by reason of their "color of title" i. e., the location notices or their option or leases from purported locators whose mineral discoveries and occupancies similarly are in question.

None of the authorities cited by defendants except Kanab Uranium applies the term "color of title" in the context of our case. I cannot find that the latter case has been followed or cited in any other case, although it has been noted by

---

35. "It was and is defendant's contention that by virtue of the act of 1903 one who has acquired the possessory rights of locators before discovery in five contiguous claims taken up as oil-bearing lands may preserve and maintain an inchoate right to all of them by means of a continuous actual occupation of one, coupled with diligent prosecution in good faith of a sufficient amount of discovery work thereon, provided such work tends also to determine the oil-bearing character of the other claims". See Union Oil Co. of California v. Smith, 249 U.S. 337, 39 S.Ct. 308, 309, 63 L.Ed. 635 (1919).

commentators.[36] Nonetheless, it must here be considered whether Kanab Uranium is a controlling decision which precludes the necessity of considering the doctrine of *pedis possessio* in its traditional aspects and forecloses anyone out of possession from entering upon a claim previously located by another notwithstanding the insufficiency of that claim.

 The rationale on which Kanab Uranium is based is clear enough—that one out of possession seeking affirmative relief by way of possession must rely upon the strength of his own right and not upon the weakness of the title of his opponent.[37] Yet the application of this rule, however common with reference to ordinary property rights has been considered inapplicable as to mining claims.[38] As to them there seems a special situation in which the possessory rights of every private interest are qualified, and the basis of each right is the mining law with its limitations as well as its protections. A recognizable right of entry, unless qualified by some paramount right other than mere possession of another private interest, seems an essential foundation of any orderly and just development of the mineral resources.

In Kanab the point upon which the decision ultimately turned was not raised or decided in the lower court, which had based its decision upon a point considered erroneous by the appellate court. There the decision was on a motion to dismiss; here it is upon the merits after the taking of evidence. There it was assumed that the decision was governed by 30 U.S.C.A. § 30 concerning proceedings in connection with applications for patent.[39] Here, no one relies upon that section. There, there was no claim that plaintiff had made discovery or locations upon the disputed property; here locations were established upon at least one claim and discovery was accomplished by plaintiff to the extent, if any, that defendants had accomplished it on some of its claims, further efforts toward discovery having been prevented by defendants by force. Moreover, there was not considered in the Kanab case the tort theory advanced by plaintiff here, involving claimed interference with business opportunity and antitrust implications.

While Kanab Uranium mentions Union Oil Co. of California in somewhat summary fashion, its own statement of the rule qualifies the rights of one in possession with the assumption that he has "complied with the law".[40] The court

36. 6 Rocky Mountain Mineral Institute 1, 21 (1961): "It is quite evident that the doctrine of *pedis possessio* is inadequate to protect the prospector under the conditions which may confront him today, unless the doctrine is strained by judicial interpretation beyond its historically-accepted limits, as in the Kanab Uranium case. This, however, is not to be desired, for there must be some limitation as to time, area, and diligence. Without such limitations, the doctrine of *pedis possessio* becomes a tool for speculators, permitting the preemption of large areas of public domain and the frustration of the policy of the general mining law. The doctrine of *pedis possessio* cannot be extended without some limitations, any more than the discovery requirement can be eliminated."

37. See Michael v. Salt Lake Investment Co., 9 Utah 2d 370, 345 P.2d 200 (1959), where it is said that "plaintiffs must prevail on the strength of their own title * * *."

38. "* * * 'The ordinary rule of law that the plaintiff must recover on the strength of his own title and not on the weakness of that of his adversary does not apply. The rule in possessory actions is that the better title prevails.' Ricketts American Mining Law, pp. 224, 225, 3d Ed. 1931", as quoted with approval in Parker v. Belle Fourche Bentonite Products Co., 64 Wyo. 269, 189 P.2d 882 (1948).

39. Cf. Titanium Actynite Industries v. McLennan, 272 F.2d 667 (10th Cir. 1959).

40. "While some of the cases say that possession may be maintained only by 'continued actual occupancy by a qualified locator or his representatives engaged in persistent and diligent prosecution of work looking to the discovery of mineral' (citing Union Oil Co. of California v. Smith, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919), they hold that 'As against a mere intruder, the possession of a mining claim by a locator who has com-

cited in intimated opposition to the Union Oil Co. case, Biglow v. Conradt, 159 F. 868, 870 (9th Cir. 1908), which itself assumed that the one in possession had "complied with the law". Thus the statements in Kanab Uranium might be reconciled with the general rule were it not for other statements which on their face tend to render the limitations of *pedis possessio* immaterial by disempowering anyone out of possession of mining claims from questioning the right of those in possession and claiming them under "color of title" although not in actual occupancy or in diligent pursuit of discovery on any particular claim.[41] Among other cases, Eilers v. Boatman, 3 Utah 159, 2 P. 66 (1883), is cited in support of this general position but while dicta in that case recites that constructive possession might be sufficient, the facts showed actual occupancy as well as a prior mineral discovery which was being developed when the adverse entry was attempted.[42] The other cited cases do not seem to support an unqualified rule.[43]

If I am bound to apply defendants' construction of some of the statements in Kanab Uranium to the present case,

there would be little more to be said. Once a claim had been located and transferred, however inadequate the location might be and whatever lack of diligence the efforts toward discovery might appear, the transferees could indefinitely enjoy a monopoly of the entire area, postpone efforts toward discovery to suit its own convenience and exclude by force every other citizen from the entire area of the public domain, however large. Without assuming to question that decision on its own facts, I do not think it can be applied mechanically to the facts of this case without disregarding the dominant meaning and policy of the statutes governing mining claims and the express holding in Union Oil Co. of California v. Smith, supra. There the distinction is clearly drawn between rights of locators after a discovery, where constructive possession is sufficient as against other claimants, and rights of locators prior to discovery, where there is protection afforded a claimant only if he is in "actual occupancy".[44] The Supreme Court said in Union Oil Co. of California:

"* * * Whatever the nature and extent of a possessory right before

---

plied with the law is of itself sufficient to prevent the intruder, even upon a peaceable entry, from acquiring a right of possession.'"

41. "No case is cited and our search has revealed none which has considered the asserted right of a citizen out of possession to challenge or litigate the validity of a mining claim of one in possession. "* * * *

"It follows, therefore, that since appellants have no title to a mining claim and assert only the right to go upon the premises to explore for minerals they are in no position to attack the validity of appellee's title to its mining claims, because it is the law without exception that in all actions to recover possession of land or an interest therein one must prevail upon the strength of his own title and not on the weakness of his adversary's title. * * * The right as general citizens which appellants assert to go upon premises occupied by another under color of title, even though defective, is not right of title entitling them to maintain this action".

42. The defendants had located the claim "upon a lode of rock in place bearing silver and other metals * * * and, besides, the facts as found by the court establish the defendants' right to the possession, and that they had done all that is required by law in order to inaugurate a title to and hold a valid mining claim, and that they were constructively, at least, if not actually, in possession."

43. "Reynolds v. Iron Silver Mining Co., 116 U.S. 687, 6 S.Ct. 601, 29 L.Ed. 774; Haws v. Victoria Copper Mining Co., 160 U.S. 303, 16 S.Ct. 282, 40 L.Ed. 436; Union Oil Co. of California v. Smith, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635; Rooney v. Barnette, 9 Cir., 200 F. 700; Duffield v. San Francisco Chemical Co., 9 Cir., 205 F. 480; Little Sespe Consol. Oil Co. v. Bacigalupi, 167 Cal. 381, 139 P. 802."

44. Cf. Eilers v. Boatman, 3 Utah 159, 2 P. 66 (1883), which was cited in Kanab Uranium but which was in no sense apposite. In Eilers, a discovery clearly had been made by the locator whose posses-

discovery, all authorities agree that such possession may be maintained only by continued actual occupancy by a qualified locator or his representatives engaged in persistent and diligent prosecution of work looking to the discovery of mineral.

" * * *

(But) "Actual and continuous occupation of a valid mining location based upon discovery is not essential to the preservation of the possessory right. The right is lost only by abandonment, as by nonperformance of the annual labor required * * *."

■ The defendants with reference to any of the bellwether claims were not in actual occupancy, nor were they diligently working to make discovery thereon at the time of plaintiff's attempted entries. The possession under the doctrine of *pedis possessio* is not sufficient if only representing an effort to exclude others rather than diligently to discover mineral. There is no doubt that on none of the three claims in question was any discovery or other work being attempted diligently or otherwise, and it seems equally as clear that none was occupied or actually possessed.[45] Manifestly, discovery had been accomplished upon some of the other claims in the general area, and with reference to other claims it could be that there was possession or occupancy with the requisite diligence in

attempting mineral discoveries to support the defense of *pedis possessio*. Even broadly, however, it must be recalled that Anaconda had acquired its interest as late as January 2, 1963, and while it had plans for systematic exploration of the entire area, and later carried them out at the expense of several hundred thousand dollars, it then actually had accomplished little change in the condition which existed previously and which clearly amounted neither to occupancy nor diligent exploration of the area as a whole or any of the bellwether claims.[46]

It may be recognized that modern conditions may make desirable, and governing legal principles may in proper cases be hospitable toward efforts on the part of prospectors to hold possession of substantial areas long enough to lay the foundations of, and to practically accomplish, their diligent exploration, although this may be a congressional and not a judicial problem. It is unnecessary to further explore here the circumstances which might authorize such an accommodation in the interest of practicality and liberality toward prospectors. Suffice it to note that here in my view there would be no basis to hold that up until the acquisition of Anaconda's interest there had been either actual occupancy or diligent discovery efforts as to the three southernmost claims in question, or that in the few weeks following January 2, 1963, Anaconda, without attempting to

sion, whether constructive or otherwise, was sustained. The commingling of this type of case with the doctrine of *pedis possessio* accounts for much of the present confusion in the law.

45. *Pedis Possessio.* Lat. A foothold; an actual possession. To constitute adverse possession there must be pedis possessio, or a substantial inclosure. 2 Bouv. Inst. no. 2193; Bailey v. Irby, 2 Nott & McC. (S.C.) 343, 10 Am.Dec. 609. Black, Law Dictionary (3rd Ed. 1951). The phrase "pedis possessio" means actual possession. Kendrick v. Lathem, 25 Fla. 819, 6 So. 871, 876; Goldberg v. Bruschi, 146 Cal. 708, 81 P. 23, 25. "Actual possession", as a legal phrase, is put in opposition to the other phrase, "possession in law", or "constructive possession".

Actual possession is the same as "pedis possessio" or "pedis positio", and these mean a foothold on the land and actual entry and possession in fact, a standing upon it, and occupation of it, as a real, demonstrative act done. It is the contrary of a possession in law, which follows in the wake of title, and is called "constructive possession". Churchill v. Onderdonk, 59 N.Y. 134, 136; Marsh v. Ne-ha-sa-ne Park Ass'n, 18 Misc. 314, 42 N.Y.S. 996, 1000; Cutting v. Patterson, 82 Minn. 375, 85 N.W. 172, 173; Rosenfeld v. United States, 2 Cir., 66 F. 303, 304, 13 C.C.A. 450.

46. See Whiting v. Straup, 17 Wyo. 1, 95 P. 849 (1908). See also Goldberg v. Bruschi, 146 Cal. 708, 81 P. 23 (1905).

drill a single hole, or to do any work whatsoever in the general area, merely because of its plans or its use of force against plaintiff, had placed itself in the position of one in actual occupancy of said claims proceeding diligently with efforts to accomplish mineral discoveries.[47] Nor is there anything in the evidence which in this case would authorize a departure from the express holding of Union Oil Co. of California v. Smith, that *pedis possessio* must be evaluated and maintained on a claim by claim basis.

Defendants maintain that in any event the plaintiff's attempted entries were "forcible, fraudulent and clandestine" intrusions upon their possession, against which defendants had the right to protect themselves or to enlist the defensive aid of the court. A short answer is that unless claimants can bring themselves within the doctrine of *pedis possessio*, that doctrine in and of itself may not protect them even against forcible, fraudulent or clandestine intrusions.[48] To understand the reasons for this, and in an effort to reconcile and in explanation of the general language in the cases,[49] it seems desirable to analyze this specific part of the doctrine with more particularity than has been attempted heretofore. While the point may or may not alter the ultimate results of this case, it is important that the point be made, I believe, if confusion which seems to exist is not to be perpetuated. I can only hope that I will not add much to the confusion.

To say that one in *pedis possessio* for a reasonable time is to be protected against forcible, fraudulent, and clandestine intrusions upon his possession, is not necessarily to say that he is entitled to the same protection if not in actual possession or if not proceeding diligently in efforts toward discovery. The reason that those in *pedis possessio* are entitled to protection against such acts seems the very confirmation of plaintiff's general position—that in the absence of discovery or *pedis possessio* on the part of the first claimant, another who is in good faith proceeding in accordance with the mining law[50] with

47. Cf. Adams v. Benedict, 64 N.M. 234, 327 P.2d 308 (1958).

48. As will be seen under part III of this opinion, apart from the doctrine of *pedis possessio*, these factors may have a bearing on the requisite "good faith" of a locator.

49. Many cases speak generally about the right of a locator to be protected against forcible, clandestine or fraudulent entries of others, but few, if any, expressly hold that one who has not accomplished discovery and who is not in *pedis possessio* is in a position to complain of the entry of another, whether by force, secretly, or otherwise. The most authoritative and applicable language on the point is found in Cole v. Ralph, 252 U.S. 286, 40 S.Ct. 321, 64 L.Ed. 567 (1920), where it is said:

"In advance of *discovery an explorer in* actual occupation and diligently searching for mineral is treated as a licensee or tenant at will, and no right can be initiated or acquired through a forcible, fraudulent or clandestine intrusion upon his possession. But if his occupancy be relaxed, or be merely incidental to something other than a diligent search for mineral, and another enters peaceably,

and not fraudulently or clandestinely, and makes a mineral discovery and location, the location so made is valid and must be respected accordingly. Belk v. Meagher, 104 U.S. 279, 287 [26 L.Ed. 735]; Union Oil Co. v. Smith, 249 U.S. 337, 346–348 [39 Sup.Ct. 308, 63 L.Ed. 635], and cases cited."

This statement furnishes more questions than answers on the narrow point being discussed. In form the first and second sentences are put in opposition, yet in substance they appear to infer the same, i.e. that whether the first locator is in actual occupation or diligent, or not, an adverse right cannot be initiated by force or fraud, etc. Literally the first sentence limits protection against forcible, etc., entries to those in "actual occupation" and "diligently searching for mineral". This seems stronger on our point than the second sentence which says that if such occupancy be relaxed another entering peaceably and openly may make a valid discovery, but which does not say what the situation would be if the second entry were not of that kind.

50. This qualification, although not expressly formulated in plaintiff's argument, is implicit therein and should be emphasized

efforts toward location and mineral discovery has an equal right to be upon the public domain. Certainly, as here, if the first claimant has made no discovery and has no foothold within the doctrine of *pedis possessio*, his forcible, clandestine or even fraudulent resistance on the public domain to the prospecting of another would be equally as, and perhaps more, unjustifiable than similar action on the part of the second claimant, because in resistance to an otherwise lawful entry the first claimant without authorization might itself be initiating such conduct.

As a matter of fact, here the defendants rather self-righteously protest against the plaintiff's "forcible and clandestine entries in the nighttime", whereas the nighttime attempts were in order to avoid a clash with defendants' armed guards and the only significant violence employed by anyone was the forcible disablement by defendants' agents of plaintiff's equipment and the physical ejection of plaintiff's agents from this area of the public domain.[51] Under the circumstances, it cannot be accepted that the guns of the defendants could be substitutes for picks, shovels or drills or for proceeding diligently with discovery, or that roving guards patrolling several square miles of desert could be in actual occupancy for the purpose of discovery within the meaning of the doctrine.[52] One seeking to maintain an unlawful possession by force is not entitled to the court's protection on that account.[53]

If a prior locator has perfected his claim by a mineral discovery, no subsequent valid location may be made, for it would be based on trespass, whether clandestine or open.[54] The reasons that one in *pedis possessio* of a mining claim is protected against forcible, clandestine or fraudulent entries of another, or may protect himself therefrom, seem to be these: If there be a peaceable, non-fraudulent and open entry by another, the one in actual possession will in all probability know of it. In such event, if there is consent or even acquiescence, the one first in possession may be deemed to accept such second entry by other as legal and in accordance with law, and both prospectors may proceed lawfully in their efforts to accomplish a mineral discovery, the first to be successful becoming entitled to the exclusive possession of the claim by reason of discovery.[55] But one in *pedis possessio* of a mining claim is protected against forcible, clandestine or fraudulent entries by another, in order that he can

here, since it is a point which renders plaintiff's position vulnerable, if any does. (See part III of this opinion.)

51. Cf. Atherton v. Fowler, 96 U.S. 513, 24 L.Ed. 732 (1878) which is one of the roots of the present forcible entry doctrine in relation to *pedis possessio*, where the entry which the Supreme Court rejected under the old pre-emption right was against other settlers who were already in actual occupancy, with houses, enclosures and crops, whom the new claimants ejected by force. In distinguishing the impropriety of such conduct from proper acts of entry upon "unoccupied land", the court stated:

"The right to make a settlement was to be exercised on unsettled land. * * * To erect a dwelling-house did not mean to seize some other man's dwelling. It had reference to vacant land, to unimproved land; and it would have shocked the moral sense of the men who passed these laws, if they had supposed that they had extended an invitation to the pioneer population to acquire inchoate rights to the public lands by trespass, by violence, by robbery, by acts leading to homicides and other crimes of less moral turpitude."

52. Whiting v. Straup, 17 Wyo. 1, 95 P. 849 (1908).

53. Haws v. Victoria Copper Min. Co., 160 U.S. 303, 16 S.Ct. 282, 40 L.Ed. 436 (1895).

54. See Clipper Mining Co. v. Eli Mining & Land Co., 194 U.S. 220, 24 S.Ct. 632, 48 L.Ed. 944 (1904); United States v. 237.500 Acres of Land, Etc., 278 F.2d 584 (9th Cir. 1960); cf. Cram v. Church, 9 Utah 2d 169, 340 P.2d 1116 (1959); Reynolds v. Pascoe, 24 Utah 219, 66 P. 1064 (1901).

55. Johanson v. White, 160 F. 901 (9th Cir. 1908).

maintain his exclusive possession for the purpose of diligently prospecting for minerals if he chooses.[56]

One not in *pedis possessio* properly needs and is entitled to no such protection, for he is merely another prospector before he makes his mineral discovery. This view again rewards diligence and promotes peaceful competition which are keynotes of the mining law. If a mineral discovery has been made, the locator doing the requisite work on his claim is protected from even the peaceable entry of another, which would be, as to him, an unauthorized trespass nonetheless.[57] Absent discovery, if the second entry is attempted clandestinely, fraudulently or forcibly, the locator who has the right to the exclusive possession of the claim within the doctrine of *pedis possessio*, may have no means or opportunity to maintain it even though he might otherwise desire to. If, being in *pedis possessio*, he were not protected against such acts, the doctrine might be rendered meaningless as to him.[58] But if he were granted such protection although not in *pedis possessio*, the doctrine would be extended beyond its purpose and justification to the disruption of the mining law and the related public policy.

To recognize that the defendants have not made out a defense under the doctrine of *pedis possessio*, as we shall presently see, is not fully determinative of related matters. I believe, however, that the key is not the supposed strength of defendants' position under the doctrine of *pedis possessio*, not the supposed weakness of plaintiff's position in view of Kanab Uranium, nor the rules governing possessory actions and property rights in general, not even any general requirement of "clean hands" or any broad remedy of equitable estoppel as urged by defendants, but the inherent limitation of the mining law itself which requires that locators of mining claims proceed in "good faith".[59]

### III.

Defendants, although they urge an "analagous" position, concede that the elements of an equitable estoppel probably have not been made out against plaintiff, and I concur. Their contention that plaintiff is foreclosed from equitable relief by application of the doctrine of "clean hands"[60] is countered by plain-

---

56. It is said in Costigan, Mining Law § 44 at 157 (1908) "If the location is peaceable, it is hard to see why the fact that it is clandestine or accomplished by strategy should make it objectionable; (referring to the statement in Erhardt v. Boaro, 113 U.S. 527, 5 S.Ct. 560, 28 L.Ed. 1113 (1885), but the theory seems to be that such a course will naturally lead to a breach of the peace, and so should be discountenanced."

57. Belk v. Meagher, 104 U.S. 279, 26 L.Ed. 735 (1881). While this case has been cited as indicating an extension of the doctrine of *pedis possessio*, and there is broad language by way of dicta, its facts do not involve rights before a mineral discovery has been made. Both of the entries in question were made peaceably; but Belk was held to have acquired no rights by his entry because at that time the prior location, supported both by a discovery and annual work, was valid.

58. In Nevada Sierra Oil Co. v. Home Oil Co., 98 F. 673 (C.C.S.D.Calif.1899), it is said that whether the location is valid or invalid, the locator cannot be forcibly, surreptitiously or otherwise fraudulently ousted while he is asleep in his cabin or temporarily absent from his claim.

59. " * * * (S)ection 2319 [predecessor of 30 U.C.S. § 22] extends an express invitation to all qualified persons to explore the lands of the United States for valuable mineral deposits, and this and the following sections hold out to one who succeeds in making discovery the promise of a full reward. Those who, being qualified, *proceed in good faith* to make such explorations and enter peaceably upon vacant lands of the United States for that purpose are not treated as mere trespassers, but as licensees or tenants at will." Union Oil Co. of California v. Smith, 249 U.S. 337, 39 S.Ct. 308, 310, 63 L.Ed. 635 (1919). (Emphasis added.)

60. Citing 1 Pomeroy, Equity Jurisprudence § 404 (4th Ed. 1918): "He who comes into a court of equity must come with clean hands * * * It is not alone fraud or illegality which will prevent a suitor from entering a court of equity; any really unconscientious conduct, con-

tiff's argument that this is not an equitable action; that in any event the facts established by the evidence do not invoke the doctrine relied upon by defendants, and that the "clean hands" maxim has no force and effect independent of substantive legal and equitable concepts, that is, that it is co-existent with, not independent of, other legal and equitable defenses.[61]

The clean hands doctrine, in its proper application, is not limited to actions purely equitable, nor is the present action limited to legal issues. But in general, as distinguished from applications peculiarly relevant to mining locations, it may be doubted whether there was such conduct, attributable or imputable to plaintiff, as to bar consideration by a court of the merits of plaintiff's position. Defendants not being in a position to invoke the protection of *pedis possessio*, an entry accomplished secretly, in the nighttime or even with force in resistance to unwarranted force on the part of defendants, would not tar plaintiff with "unclean hands", and any conduct in the nature of fraud on plaintiff's part could be deemed hardly so flagrant as to deprive the plaintiff of an opportunity to be heard on the merits in relation to rights less sensitive than mining claims.

But with reference to mining claims, there are at least two related considerations which lead me to believe that the circumstances giving rise to, and attendant upon, plaintiff's attempted entries in January and February, 1963, upon the areas of the bellwether claims, are such as to be determinative, beyond general rules governing the "clean hands" doctrine: (1) The mining law, the customs of miners and public policy are alike sensitive to the good faith of claimants to mining property,[62] and (2) from this viewpoint the good or bad faith of the plaintiff established, or conditioned and qualified, as the case may be, its right of entry upon the public domain as against others who had already entered in good faith. Thus the "clean hands doctrine" may be invoked liberally, not as an independent defense but in recognition of substantive legal and equitable concepts relating to the good faith requirement.[63]

I find myself unable to accept here the proposition that citizens acting in good faith to make a mineral discovery upon the public domain upon land open under the law to mineral location, lawfully can be forcibly excluded therefrom by other citizens who are not in actual possession of the area, are not proceeding diligently to make discovery and who have no more than prior constructive possession and the ability and readiness to marshal enough force to preclude entry by the public. As between the parties thus contending, the good faith of one side is no better or worse than the good faith of the other. Each is asserting an exclusive right by force, stealth or otherwise to explore for minerals upon the public domain which both have the right to enjoy. But I have no difficulty in concluding, as I do, that if the subsequent claimant is seeking to obtain possession by questionable means amounting to a demonstration of bad faith, either in the sense that he has unconscionably improved his position at the expense of his competitor, or unfairly worsened his competitor's position to his own aggrandizement, he does not qualify as a locator against such competing interest.

"Good faith" in other contexts has been held to be something more than a colorable claim, although belief in the pro-

---

nected with the controversy to which he is a party, will repel him from the forum whose very foundation is good conscience."

61. Pound, On Certain Maxims of Equity, Cambridge Legal Essays 259 (1926); Chafee, Coming into Equity with Clean Hands, 47 Mich.L.Rev. 877, 1065 (1949).

62. Bagg v. New Jersey Loan Company, 88 Ariz. 182, 354 P.2d 40 (1960); United States v. State of Wyoming, 331 U.S. 440, 67 S.Ct. 1319, 91 L.Ed. 1590 (1947).

63. See Chafee, Coming into Equity with Clean Hands, 47 Mich.L.Rev. 877, 1065 (1949) supra.

priety of a claim is an element to be considered.[64] It is axiomatic that a locator must act in good faith, and even though a prior locator's claim may be invalid, bad faith may render the subsequent claim ineffectual.[65] It has been said that "(E)ntry must always be peaceable, open, and above board, and made in good faith, or no rights can be founded upon it",[66] and while such expressions usually are found when *pedis possessio* is sustained, they state a more pervasive policy of the law.[67]

Good faith is not specified as a location requirement in the mineral locations laws themselves. It has been inferred by the courts from the purpose of these laws "to further the speedy and orderly development of the mineral resources" of the public lands.[68] Some cases have already broadened the bona fides doctrine to require a locator to exercise "good faith" toward prior holders of defective claims.[69] It has been asserted that these applications are unsound, and Kanab Uranium Corp. v. Consolidated Uranium Mines, 227 F.2d 434 (10th Cir. 1955), has been cited as a special example in this respect since there was said to be involved only constructive possession without discovery.[70] But even the writer entertaining such a view would distinguish cases where there has been a violation of confidence. It is said:

"This doctrine would permit parties to hold their claims by actual or constructive possession of any part, without compliance with the specific location and assessment work re-

quirements of federal and state law. It runs contrary to the developmental objective of the mining laws and should be limited to cases where the subsequent party is responsible for infirmities in prior locations, where an infirmity is of a purely formal nature, or where the subsequent party enters forcefully or clandestinely upon the actual possession of the prior locator." [71]

I believe that only in the context of the "good faith" requirement can Kanab Uranium have continued meaning beyond its own peculiar facts, but that in that context it is of controlling persuasion here.

Any question of good faith involves primarily the position and activities of Ford. The evidence showed that he was a consulting geologist, with headquarters at Riverton, Wyoming. He came to the area in question in 1960, and upon examining the properties which are the subject of this lawsuit, concluded that they had value. He recognized the ownership of Moody and his predecessors in the claims and prepared a prospectus in which he represented generally that the property was worthy of acquisition from Moody. The prospectus was offered to G.B.C., among other companies. G.B.C. thereupon undertook to acquire the Rawlinson group from Moody pursuant to the agreement of May 15, 1961. Ford then secured employment with G.B.C. and assumed control of these properties on its behalf, expending approximately $250,-000 in the maintenance of claim bound-

64. United States v. State of Wyoming, 331 U.S. 440, 67 S.Ct. 1319, 91 L.Ed. 1590 (1947).

65. Bagg v. New Jersey Loan Company, 88 Ariz. 182, 354 P.2d 40 (1960).

66. Miller v. Chrisman, 140 Cal. 440, 73 P. 1083, 1084 (1903).

67. Cf. Brown v. Murphy, 36 Cal.App.2d 171, 97 P.2d 281 (1939), where both discovery and actual possession were invaded and the good faith of the relocator was discussed even though on general principles the second entry whether in good faith or not appeared to be invalid.

68. 1 American Law of Mining § 5.4, at 720 (1964); United States ex rel. United States Borax Co. v. Ickes, 68 App.D.C. 399, 98 F.2d 271 (1938); Bagg v. New Jersey Loan Company, 88 Ariz. 182, 354 P.2d 40 (1960); Burns v. Clark, 133 Cal. 634, 66 P. 12 (1901).

69. See Brown v. Murphy, 36 Cal.App.2d 171, 97 P.2d 281 (1940).

70. 1 American Law of Mining § 5.4, at 722 (1964).

71. 1 American Law of Mining § 5.4, at 722 (1964).

aries, relocating, surveying and mapping, exploration, drilling and assaying. The relocation program, involving the blanketing over the existing claims of new G.B.C. claims was undertaken after G.B.C. had reported to Moody that the previous locations were insufficient and that "substantially all of the claims [were] devoid of apparent mineralization".[72]

After the July, 1962, default, Moody forfeited G.B.C.'s interest in the claims pursuant to the contract, and commenced a limited drilling program. He employed John Ortman, an employee of Ford, to log the drill holes and to assay samples. The drilling revealed significant beryllium-bearing tuff in some areas. Ortman made available to Ford the information which he had acquired while in the employ of Moody.

During the fall of 1962, Ford attempted to interest a number of companies in acquiring the Moody properties. He furnished a prospectus [73] to Ranchers Exploration and Development Corp. "to provide information regarding beryllium properties of Richard D. Moody as owner and lessor * * * to permit Ranchers * * * to evaluate the property, to determine the extent of its interest and to provide a basis for negotiation." He indicated therein that he considered all of Moody's claims "worthy of acquisition". Ford also contacted other companies in an attempt to interest them in the acquisition of Moody's claims.

Ranchers became interested in the property and was placed in contact with Moody by Ford on several occasions in an attempt to purchase Moody's interest. Anderson, President of Ranchers and another officer, entertained Moody at Las Vegas, and were advised that he was negotiating also with Anaconda and Brush. In November, 1962, Ford recorded a previously executed document giving him a personal royalty interest in anything that G.B.C. owned. Up until that time Moody had no notice that Ford was claiming a personal interest in the Spor Mountain area.

During late December or the first part of January, 1963, Ford and Anderson as President of Ranchers, determined to jump Moody's claims to the extent that discovery had not been accomplished upon them. After this plan was determined upon and while it was undisclosed and unknown to defendants Ford and Anderson continued to negotiate with Moody and obtained permission to get the results of Moody's prior drilling results from Ortman. At that time Moody did not know that Ford was claiming a personal interest in the area. After plans for staking conflicting claims had been made by Ranchers and Ford, and after Ford was advised on January 8, 1963, that Anaconda was locating certain Filler claims on behalf of Moody, Ford first disclosed to Anaconda and Moody that he asserted a personal interest in that land.

More than a week prior to January 12, 1963, plans had been implemented for relocating Moody's claims, then known to have been acquired by Anaconda, by the mapping of the areas where the new claims were to be located, by the utilization of Moody's drill hole information obtained from Ortman, and other drill hole information available to Ford from his previous employment by G.B.C., in determining the new claims, and by ordering the printing of signs and the procurement of claim stakes.

Ford, acting for and within the scope of his employment by plaintiff, planned each of the three attempted entries by Ranchers, supervised the mapping of the areas where claims should be located in order to cover ore bodies believed by him to exist from information previously obtained as an employee of G.B.C. and

72. Letter from Keller, Lohf, Roath, Murphy and Moran, attorneys for G.B.C. to the attorney for Moody, with copies to Moody and Ford, dated August 18, 1961. For a further history of the G.B.C.—Moody relationship, then involving Ana- conda for a time but only as an optionee, see Moody v. General Beryllium Corporation, 224 F.Supp. 934 (D.C.Utah 1963) supra.

73. Dated September 7, 1962.

in ostensible negotiations to purchase Moody's claims for Ranchers. Ford personally directed activities during the three attempted entries. Since then, Ford has acquired a personal interest in any rights that may be recognized in Ranchers in the disputed claims and in any damages that may be recovered in this action.

Under these circumstances I have concluded that Ford would not be in the position of one attempting in "good faith" to locate the particular claims in question in January and February, 1963. I have further concluded that all of his conduct and position is imputable to plaintiff either by reason of authorization or ratification, and that if .as to some particular element this does not affirmatively appear in the record, his position and that of the plaintiff Ranchers are so interwoven that it is nonetheless infeasible to separate the bad faith of one from the other by reason of considerations akin to unjust enrichment.[74]

I cannot find that Ford and his principal, Ranchers, were in bad faith in the sense that they did not believe that they had a right to relocate the defendants' claim if no valid discoveries had been made by the latter. But belief in the efficacy of legal technicality is not the only inquiry on the question of good faith. Good faith also necessarily involves an honest intention to abstain from taking any unconscionable advantage of another even through the forms or technicalities of law.[75] Knowledge of an adverse claim does not of itself indicate bad faith and may not even be evidence of it unless accompanied by some improper means to defeat such claim.[76] But here in my judgment the facts transcend these proper situations and require a holding that plaintiff's claims to the bellwethers in question are inferior to the claims of the defendants. The case may be close to the line; and my decision is not in any sense a moral judgment, but a practical application of what I regard to be the proper rule of law that must be applied.

I believe it to be sound doctrine that second entries upon mining claims are rendered insupportable as against those seeking to maintain their prior possession short of mineral discovery or *pedis possessio* only if the subsequent entries are not made in good faith. The law cannot recognize mineral discoveries upon the three bellwether claims specified, nor any rights of the defendants therein under the doctrine of *pedis possessio*. I cannot accede to the theory that citizens acting in good faith can be prevented from entering into, or can be lawfully ejected from, the public domain by other claimants who have not made, or are not working diligently to make, mineral discoveries within the established doctrine of *pedis possessio* merely because they have the physical power to pre-empt large areas of the public domain by force, or because they thereby require the ejected party rather than themselves to seek affirmative relief in court. The public policy against breaches of the peace, monopolization and speculation with respect to mineral rights on the public domain are too compelling to permit any such jockeying for position to be determinative on this point.

For the reasons stated herein, in view of the stipulation of facts on file and the findings herein contained, which are believed adequate to satisfy the requirements of Fed.R.Civ.P. 52(a),[77] relief is

---

74. Cf. Lowry v. Silver City Gold and Silver Mining Company, 179 U.S. 196, 21 S.Ct. 104, 45 L.Ed. 151 (1900), where participation in improper conduct by only part of plaintiffs in error was accepted as sufficient to defeat the claims of all.

75. Jennings v. Lintz, 50 Or. 483, 93 P. 327 (1908).

76. Thurmond v. Espalin, 50 N.M. 109, 171 P.2d 325 (1946).

77. I have endeavored to make findings on all of the significant issues presented in the pre-trial order even though point III is believed dispositive of those now before me, to the end that a retrial might be avoided should the final significance of the other points be lighted up by the decision of the Court of Appeals.

hereby denied to the plaintiff on the submitted issues concerning the bellwether claims. I express no opinion concerning the reserved issues nor the effect, if any, of this decision upon them.

In any event, this interlocutory decision involves controlling questions of law as to which there is substantial ground for difference of opinion, and an immediate appeal may materially advance the ultimate termination of the litigation.[78]